NOTICE
Decision filed 03/13/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 210305-U

NO. 5-21-0305

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| COLLEEN CADIGAN, as Executrix of the Estate of Elizabeth J. Driscoll, Deceased, | ) ) ) | Appeal from the Circuit Court of St. Clair County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 18-L-572 |
| JOHNSON & JOHNSON and JOHNSON & JOHNSON CONSUMER, INC., | ) ) ) ) | Honorable Christopher T. Kolker, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Hackett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's denial of plaintiff's motion for a new trial is affirmed where the trial court did not err in striking Dr. Nicholson's testimony, *in toto*, as a sanction for her failure to appear for cross-examination and denying plaintiff's additional requested sanctions. Defense counsel did not invite error into the record by referencing prior iterations of the complaint.

¶ 2    Plaintiff, Colleen Cadigan, as Executrix of the Estate of Elizabeth J. Driscoll,[1] deceased,

appeals from the jury verdict and judgment in favor of defendants, Johnson & Johnson and Johnson

& Johnson Consumer, Inc. (collectively J&J) and the trial court's denial of her request for a new

trial. On appeal, plaintiff argues that the trial court striking Dr. Nicholson's testimony due to a

_____

[1]Elizabeth Driscoll was called "Betty" when she was alive. She was referred to as "Betty" during the trial and therefore we use the name "Betty" in our decision.

1

failure to return for cross-examination and denial of plaintiff's requested sanctions were abuses of discretion. She further contends that defendants' reference to prior iterations of the complaint during cross-examination inserted plain error into the proceedings requiring a new trial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On August 29, 2018, plaintiff filed suit against defendants J&J, Imerys Talc America formerly known as Luzenac America, Inc. (Imerys),[2] and Walgreen Co. (Walgreen). The complaint alleged that Betty died from ovarian cancer and that Betty's cancer was due to the unreasonably dangerous and defective nature of talcum powder, which was a major ingredient in Johnson's Baby Powder and Shower to Shower products. The complaint alleged that Betty regularly and habitually used those products on her perineal area. Plaintiff contended that Imerys mined and distributed the talcum powder used for the products, J&J manufactured the baby powder products, and Walgreen sold, distributed, and marketed the baby powder products. Eight counts were brought under the Probate Act of 1975 (Survival Act) (755 ILCS 5/27-6 (West 2016)) that alleged: strict liability for failure to warn against all defendants (count I), negligence against all defendants (count II), negligence against J&J (count III), negligence against Walgreen (count IV), breach of express warranty against J&J (count V), breach of implied warranties against J&J and Walgreen (count VI ), civil conspiracy against J&J and Imerys (count VII), and negligent misrepresentation against J&J and Imerys (count VIII). The complaint also contained eight counts under the Wrongful Death Act (740 ILCS 180/0.01 *et. seq*. (West 2016)) that included strict liability for failure to warn against all defendants (count IX), negligence against Imerys (count X),

_____

[2]Imerys provided the talc raw material to J&J. Imerys was previously known as Luzenac and/or Rio Tinto. For simplicity, "Imerys" is used for all iterations of the company.

2

negligence against J&J (count XI), negligence against Walgreen (count XII), breach of express warranty against J&J (count XIII), breach of implied warranty against J&J and Walgreen (count XIV), civil conspiracy against J&J and Imerys (count XV), and negligent misrepresentation against J&J and Imerys (count XVI). Imerys was severed from the case on March 11, 2019, after filing a notice of suggestion of bankruptcy.

¶ 5    On August 27, 2019, plaintiff filed her first amended complaint. The amended complaint listed the defendants as J&J and Walgreen Co. The complaint continued to allege the harmful products consisted of Johnson's Baby Powder and Shower to Shower. At plaintiff's request, and over Walgreen's objection, the trial court issued an order severing Walgreen from the case on November 25, 2019.

¶ 6    Plaintiff filed a second amended complaint on March 5, 2020. Despite the previous severance of Walgreen, the amended complaint listed J&J and Walgreen as defendants. The trial court ordered plaintiff to remove Walgreen from the second amended complaint by March 12, 2020. Plaintiff's revised second amended complaint was filed on March 13, 2020, and J&J (collectively) were listed as the sole defendants. The complaint again alleged that Betty's death was due to ovarian cancer but limited the product at issue to Johnson's Baby Powder and listed Betty's usage as "regularly and habitually throughout her adolescent and adult life." Counts I-VI brought under the Survival Act alleged strict liability for failure to warn (count I), negligence (count II), breach of express warranty (count III), breach of implied warranty (count IV), civil conspiracy (count V), and negligent misrepresentation (count VI). Six identical counts were alleged under the Wrongful Death Act as counts VII through XII.

¶ 7    The case was set for trial in 2020, but orders were issued vacating the settings due to COVID-19 concerns. During this time, numerous motions to exclude expert testimony were

3

submitted and J&J moved for summary judgment. On April 20, 2021, the trial court issued an order denying motions to exclude expert testimony by plaintiff's experts, Dr. Smith, Dr. Godelski, Dr. Plunkett and Dr. Rigler. It also denied J&J's motion for summary judgment.

¶ 8       The jury trial ran for three weeks from July 12, 2021, to July 30, 2021. Once the jury was sworn in, the court advised the panel, *inter alia*, that if the court struck evidence or comments of counsel or a witness, the panel would be instructed to "completely disregard it and erase those from your mind as if they were never mentioned." Opening statements were provided. During defendants' opening statement, counsel discussed Betty's alleged use of talc-based products, noting that no one, including the plaintiff, was aware of Betty using those products. Defense counsel addressed prior iterations of the complaint stating,

> "But you're going to hear that *** when they brought the lawsuit *** they
> said in the beginning *** that [Betty] regularly and habitually throughout her adult
> life used two products, Johnson's baby power and Shower to Shower. ***.
>
> So[,] when the lawsuit started these were the allegations. *** Then all of a
> sudden there was no allegation. They took it back that she had used the Shower to
> Shower product. No more. No allegations that it was this 70-year period of use.
> Now halfway through the lawsuit there was a[nother] change. And the allegations
> became that the use was from 1965 to 1971 and then again from 1996 to 2002. And
> then the lawsuit progressed a little more and there was a change again. And then
> they had one other family member write an affidavit and say there was a period of
> time in the late 1960s when this family member shared a room with [Betty]. And
> you're going to hear the testimony is that [Betty] was sort of near a closet facing
> away from the prior person who did the affidavit, and from behind this family

4

member might have seen shaking of talc. There's where we went from the entire 70 years down to this four-year period from behind towards the closet."

No objection was raised to any argument presented by defense counsel during opening statement.

¶ 9     Dr. Laura Plunkett, a board-certified toxicologist with degrees in zoology, pharmacology, and neuropharmacology and training in pharmacokinetics, provided direct testimony for plaintiff on July 14, 2021. She discussed the connections between toxicology and regulatory issues from the Food and Drug Administration (FDA). Dr. Plunkett explained that cosmetic products and their ingredients were determined by, and remained the responsibility of, the company. Cosmetic products were not approved by the FDA. Further, unlike prescription medications which were required to show a benefit to the users despite any side effects, cosmetics were simply required to be safe enough to be marketed. Dr. Plunkett stated that the safety assessment was done by the company. After the product was marketed, if a safety concern arose, the FDA had to prove the product was not safe.

¶ 10    Dr. Plunkett testified that Johnson's Baby Powder had been on the market since the late 1800s and cosmetics had no regulations at that time. The first regulations came in 1938, and she classified those as "vague." She stated that in 1975, more specific regulations were added that included requiring a warning statement when a product was potentially unsafe. She stated that removal of a product from the market was a company decision because the FDA did not have the power to remove a cosmetic product. At most, the FDA could request a product be removed and the company could voluntarily withdraw it. Dr. Plunkett also addressed the regulations for cosmetic products and labeling stating that the regulations required labels to bear a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with a product.

5

¶ 11 Dr. Plunkett explained that inflammation in the body was a process that could be acute or chronic, with the latter involving a process that did not heal. She opined that chronic inflammatory processes could turn into cancer. She also provided a primer on the female reproductive system and discussed how a talc particle could cause cancer.

¶ 12 Dr. Plunkett then spent the remainder of the day addressing research studies and J&J documents related to talc and cancer. More specifically, she addressed research studies issued between the 1930s to the early 1990s that involved inhalation of silica dust, migration of talc through a woman's reproductive system, reactions in peritoneal tissue stemming from industrial and pure mineral dust, post-operative complications involving granulomas, talcum powder on surgical gloves, substitution of corn starch for talc in products that used powder, and cervical tumors that contained talc within the tumors. Dr. Plunkett opined that with all the research during that period, J&J was on notice that it should be looking into the issue, and after the research in the 1970s and 1980s was published, J&J should have placed a warning on its talc-based baby powder products addressing the possibility that it could cause ovarian cancer.

¶ 13 Dr. Plunkett continued her direct testimony on July 15, 2021. She discussed the July 1993 meeting minutes from the Talc Interested Parties Task Force that was to discuss a previous meeting held with the International Society of Regulatory Toxicology and Pharmacology (ISRTP). ISRTP was asked by the FDA to prepare a two-day symposium on talc safety and related issues. She opined that ISRTP was "industry friendly" and was also funding a portion of the symposium with the FDA. She then addressed complaints directed to ISRTP's Journal of Regulatory Toxicology and Pharmacology claiming the symposium was biased. She also addressed a letter written directly to the Johnson & Johnson chief executive officer, citing studies that revealed a link between talc and ovarian cancer in 1994. The letter requested: (1) discouraging the use of talc as daily genital

hygiene, (2) withdrawing the talc products and using a substitute like corn starch, or at a minimum (3) labeling the products with the risk of ovarian cancer. Dr. Plunkett also addressed letters reaching the opposite conclusion in 1997.

¶ 14    Dr. Plunkett discussed research published in 1999 finding a significant association between the use of talc in genital hygiene and the risk of epithelial ovarian cancer, as well as documents from Imerys to J&J about how to address the issue with governmental agencies. She also discussed the governmental response to the issue noting that the National Toxicology Program (NTP), which was a program under the National Institutes of Health (NIH), ultimately determined they were removing talc from the nomination list of possible carcinogens in 2005. Conversely, the International Agency for Research on Cancer (IARC), which was a part of the World Health Organization (WHO), labeled talc as a possible carcinogen in 2006 on its website and formally published the monograph addressing talc in 2010. Dr. Plunkett also addressed Material Safety Data Sheets (MSDS) that listed talc as a carcinogenic product on Imerys' shipments of talc to J&J and the two failed citizen petitions dated 1994 and 2014 directed to the FDA from the Cancer Prevention Coalition (CPC) that requested a labeling change. Dr. Plunkett stated that ultimately both requests were denied by the FDA and insinuated that the FDA was biased in its decision based on later employment opportunities provided to the head of the FDA. Dr. Plunkett ended the day discussing the underlying documents and draft decision by Health Canada in 2018 (later published in 2021) finding "perineal exposure to talc *** a potential concern for human health" which led to talc being placed on the "hot list" which required specific warnings on products sold in Canada. Dr. Plunkett also addressed J&J's decision to cease selling talc-based baby powder in North America in May 2020 and the fact that the product never contained a warning label. She opined that J&J failed to act as a reasonable company by failing to warn the public about the talc ovarian

7

cancer hazard regardless of whether the federal regulations were considered. She further opined that J&J should have placed a warning on the product and its failure to include a warning on the product put women at risk.

¶ 15    On July 16, 2021, cross-examination and redirect examination of Dr. Plunkett occurred. She agreed that she was not there to discuss whether Betty's ovarian cancer was caused by baby powder. She did not read any medical records or deposition testimony as it related to Betty. She was unable to address why there was no mention of baby powder in Betty's medical records or why the amount of time that Betty allegedly used baby powder changed three times during the case. She was also unaware of why the original complaint included Shower to Shower as a product but no longer did. Dr. Plunkett believed that a threshold event regarding talc and ovarian cancer required use of the product for a certain amount of time and frequency before an increased risk for ovarian cancer would be attached. The studies referred to a 10,000 plus application threshold which would be daily application for 27 years. Dr. Plunkett did not know how often Betty used baby powder and was also unaware that no witness was going to testify that Betty used baby powder after 1970. She agreed that in other talc litigation trials, she talked about the contaminants found in baby powder, including asbestos, but did not know if any of the other contaminants were found in Betty. She stated that despite her previous testimony, it was her belief that talc alone was sufficient to be toxic. She could not recall if she had been previously told that no talc fibers were found in Betty's tissue samples. According to plaintiff's pathology report, approximately 1,400 particles were found in Betty's tissue. Dr. Plunkett agreed that she was not asked to evaluate those particles, or address whether any of them were toxic, although she stated she would be able to do that, if asked.

¶ 16　Dr. Plunkett agreed that she could not speak on behalf of the FDA and was never an employee of the FDA. Her title of "FDA specialist" was not provided by the FDA but was self-imposed. She never worked for any regulatory agency. She was a paid consultant for 30 years and the FDA never asked her to consult for them. She was involved in her first case working for the plaintiff's side in 2003, and by 2019, one-half of her income came from working for plaintiff's lawyers in litigation. She agreed that over her career she made millions of dollars working as an expert witness and that her testimony always found the baby powder warnings were inadequate. The only exception was her previous work in support of pesticides and lead paint, neither of which she believed were toxic.

¶ 17　She also disagreed that Dr. Gilbertson, of the FDA, opined that Johnson's Baby Powder was proven to be among the safest of all consumer products following the two-day symposium in 1994, stating that the symposium minutes were an inaccurate summary of the meeting. Dr. Plunkett agreed that while she relied heavily on the Cramer study from the 1990s, she did not advise the jury of the United States governmental response which found the study was misinterpreted statistically, uncorrected for several likely biasing factors, and was strongly contradicted by another study. The contrary study showed a significant relative risk in the negative direction. She also failed to address the government conclusion that "there appears to be no association between customary human talc use, *per se*, and ovarian cancer." Dr. Plunkett acknowledged the Nurses' Health Study, which was a large prospective cohort study that revealed no overall association with talc use and epithelial ovarian cancer. While the FDA put stock in that study, Dr. Plunkett believed that the IARC document was more persuasive.

¶ 18　Dr. Plunkett also addressed the Health Canada study by Fletcher and Saed in 2021. She agreed that at the time of the study and its publishing, Saed was a paid plaintiff's expert by

9

plaintiff's attorney (Mr. Meadows) in this case. The plaintiff's attorney also paid for the study. The conflict was not previously noted, and Dr. Plunkett did not know that the study was rejected by the journal when Saed initially attempted to publish it.

¶ 19    On redirect examination, Dr. Plunkett agreed that by the 1950s, J&J knew that talc was toxic. She agreed that despite all the literature, J&J chose not to warn people about the product. Instead, they advertised the product in magazines geared toward teenagers. Dr. Plunkett testified that sufficient information was available to J&J for them to put a warning label on the product. She also addressed additional evidence including a slide presentation from Imerys' parent company listing the most expensive part of talc mining was the "litigation risk," a J&J email using the phrase "protect the franchise," and a second email classifying Johnson's Baby Powder as a "golden egg" launched in 1890. Dr. Plunkett disputed a 2018 statement issued by J&J touting its safety assurance. She found the entire statement false. She stated that Health Canada agreed with her and that talc caused ovarian cancer. She also agreed that J&J never placed a warning on the product. Instead, they announced that they were no longer selling the product in the United States or Canada. She agreed that a trade magazine stated that the decision not to sell came less than a month after a court ruling that opened the door to thousands of lawsuits against J&J, but that J&J attributed the decision to reassessment of products during COVID-19.

¶ 20    On July 19, 2021, plaintiff called John Goleski, a pathologist from Boston, Massachusetts, to testify. He was hired to review Betty's pathology slides, provide a diagnosis, and look for the presence of foreign particles, especially talc, in Betty's tissue. He stated that the slide tissue came from Betty's hysterectomy performed following her diagnosis of cancer. He reviewed the original pathologist's report and agreed with the finding that Betty had serous ovarian cancer.

10

¶ 21    Dr. Goleski stated that he used an electron scanning microscope with polarizing filters to determine if any birefringent particles[3] were present in Betty's slides. He then discussed his findings while showing pictures of the slides at different magnifications to the jury. He explained that macrophages take up particles and emit cytokines and chemokines that bring in other inflammatory cells. This was part of the inflammatory process. He stated that talc lessened the macrophages' capabilities to take up particles and therefore additional macrophages would be summoned to the area which was why many macrophages were seen in areas with talc. He explained that macrophages could kill bacteria, inactivate viruses and affect DNA or surrounding cells which he opined would start the process toward the development of malignant cancer. He stated that typically the tissue blocks with the most birefringent particles correlated to the blocks with the most talc. He further explained that the talc from gloves on the outside of the tissue block was common, so it was only relevant if the talc was inside the tissue block specimen.

¶ 22    Dr. Goleski testified that he found 16 particles of talc in three of Betty's tissue blocks. One block of the right ovary had 10 particles, the second block of the right ovary had 5 particles, and the fallopian tube block had 1 particle. He opined that there were likely thousands of talc particles in Betty's tissue. He stated that the original pathologist did not polarize the slides to look for birefringent particles or use a scanning electron microscope to view the slides. The original pathologist merely identified the tumor and the extent of the tumor. He explained that numerous other particles were also seen but no granulomas were seen. He further explained that granulomas, which generally wall off particles, did not generally occur with talc because the talc particles were so small.

---

[3]Birefringent particles are materials that appear bright when viewed under a polarized light microscope. Birefringent particles stem from numerous types of materials, including minerals, which would include talc.

¶ 23    Dr. Goleski explained that when a person had a shortened life span with a tumor or end stage heart failure, fluid would collect in the lungs. He further explained that talc pleurodesis was the process of injecting talc particles into the pleura of the lung to help to block fluid from entering the space and assist with breathing. He stated that only very large talc particles could be used and the process could produce a granulomatous response. He did not consider talc pleurodesis as evidence that talc was safe, noting that it was only used in end stage patients. He stated that lung cancer stemming from the process was unlikely because it took years for lung cancer to occur and people who receive talc pleurodesis treatments already had shortened life spans. He opined that use of talc in the perineal region was different because it was a daily occurrence and the body reacted differently. Dr. Goleski concluded by confirming that his report stated that the talc found in this case confirmed Betty's exposure and was contributory evidence for a causal link between the presence of the talc and the development of Betty's ovarian cancer.

¶ 24    On cross-examination, Dr. Goleski confirmed that the only medical record he reviewed was the pathology report. He confirmed that he found 16 talc particles and opined that they came from talc in the perineum. He did not know how long the particles were in Betty's body. He agreed that he could not state absolutely that the talc was from Johnson's Baby Powder, but the talc had special characteristics of that baby powder. He stated that beyond the 16 particles of talc, most of the remaining 1,600 particles were calcium, which was typical of serous carcinoma and chemotherapy. He did not know if Betty had any prior surgeries or other medical treatment in the 68 years prior to her cancer diagnosis. He was unaware of the allegations related to how long or how much baby powder Betty may have used and did not know that it was seven years, as stated in plaintiff's opening statement. He agreed that talc was everywhere and could be in soap used to wash a body and that everyone in the courthouse was breathing a little bit of talc while they were

12

there. He also agreed that douches, diaphragms, condoms, and tampons would also contain talc. He stated there was a 30% increase in the risk of cancer from talc which was significant.[4] He agreed that he became a plaintiff's expert in 2016 and began writing and publishing papers on the issue of talc and cancer in 2017 after taking a 10-year hiatus. He agreed that he was listed as an expert on a plaintiff's attorney website.

¶ 25    Dr. Ellen Blair Smith testified that she was a board-certified gynecological oncologist from Austin, Texas, who would testify about the diagnosis, treatment, and causes of ovarian cancer. She provided her education, qualifications and background regarding her 35 years in gynecological oncology and her later transition into hospice and palliative care, which was end of life care and treatment. Dr. Smith reviewed the evidence and addressed whether the genital application of talcum powder could cause ovarian cancer. She believed that, under the Bradford Hill criteria,[5] that repeated applications of talcum powder to the female genitalia was a contributing cause of the development of ovarian cancer. In this case, she believed that Johnson's Baby Powder was a substantial contributing cause of Betty's epithelial serous ovarian cancer. She stated that approximately 14,000 women died from ovarian cancer each year and that 10% of those deaths were due to talcum powder usage. The symptoms were generally non-specific, so most ovarian cancers were widely spread by the time of diagnosis. Approximately 75% would be diagnosed at stage III or IV, which meant the cancer had spread to other parts by the time it was diagnosed. Most of the cancers were treated with surgery and chemotherapy. Betty's surgery involved removal of the uterus, fallopian tubes, ovaries and the omentum.

---

[4]This would also be the equivalent of a positive relative risk of 1.30.
[5]The Bradford Hill criteria is used in epidemiology to assess the strength of evidence between an exposure and an outcome to determine if the relationship is causal or correlational.

13

¶ 26     Dr. Smith explained that it took multiple factors to make the necessary DNA mutations to become cancer. Those were known as risk factors which included inherited genetic mutations, familial members with ovarian cancer, advanced age, not having a child, endometriosis, use of talcum powder, chronic inflammation, polycystic ovarian disease, smoking, the duration of the woman's monthly period and starting a monthly cycle early and finishing it late in life. Each of those factors increased the risk of ovarian cancer. She addressed the female anatomy and discussed studies that showed upward migration in the female reproductive system. She further explained that talc was not an inert substance and caused inflammation in the body similar to corn starch; however, talc could not be absorbed by the body unlike corn starch that was eventually metabolized by the cells into sugar. She addressed numerous studies that associated inflammation with increased risk of ovarian cancer. She classified baby powder as a modifiable risk because a person could decide if they were willing to take the risk, as opposed to family history which could not be changed.

¶ 27     Dr. Smith testified that the use of oral contraceptives and tubal ligations also increased the risk of ovarian cancer along with talcum powder and being Caucasian. She disagreed that the use of talcum powder in the genital area was safe. She stated that the risk of ovarian cancer would increase with the number of risk factors involved. She agreed there were more than 35 studies from 1982 to 2016 that consistently showed an increased risk of ovarian cancer with the use of talcum powder. She believed that appropriate warnings of that risk were essential stating that the research revealed a consistent 20 to 50% increase in risk of serous ovarian cancer associated with genital talcum powder use.

¶ 28     Dr. Smith provided additional testimony on July 20, 2021. In summary, she stated that the epidemiologic studies in their totality demonstrated a consistent and statistically significant

increased risk of developing epithelial ovarian cancer with genital talcum powder use. She stated that serous ovarian cancer, which was the most common subtype of epithelial ovarian cancer, had an elevated risk of 20 to 50%. That risk was replicated among case-control studies, one cohort study, and all meta-analyses, which was a pooled analysis over nearly 40 years. She found that the consistent results provided strength for the studies that found an increased risk. She also addressed the dose response trend which addressed the frequency that talc was used. She stated that in her opinion, the genital use of talcum powder could cause ovarian cancer. She stated that Health Canada reached the same opinion.

¶ 29    Dr. Smith stated that she reviewed Betty's medical records and the deposition testimony from this case. As to Betty's use of Johnson's Baby Powder, Dr. Smith relied on reports from affidavits and depositions of Betty's relatives. Those documents revealed regular usage from 1966 to 1973. She stated that Betty started coughing and having nausea in December 2014, that initially got better but returned at the end of January 2015. Betty would cough so hard it would cause her to vomit. Betty could not eat, was having trouble with her bowels, and eventually went to see a physician. The physician noted that Betty's heart rate was very fast and requested a chest x-ray that revealed fluid between her lung and the chest wall known as a pleural effusion. Betty was admitted to Barnes Jewish Hospital, and a chest CT scan confirmed the pleural effusion and also revealed three blood clots in her lung known as pulmonary emboli. Additional CT scans of Betty's abdomen and pelvis revealed fluid in her abdominal cavity, cell ascites, and a mass in her pelvis, which was thought to be an ovarian tumor. A thickening of the peritoneal cavity was noted which was consistent with tumor implants. Ovarian cancer was suspected. Fluids from Betty's lungs and abdominal cavity were drawn and revealed serous ovarian cancer cells. Due to the blood clots, and

15

the need to treat those with blood thinners, Betty was not a surgical candidate, so chemotherapy was her only initial option for treatment.

¶ 30    Betty was eventually released from the hospital and received chemotherapy treatment from Dr. Hagemann, a gynecologic oncologist at Washington University, who started Betty on Carboplatin and Paclitaxel to shrink the tumor. Betty tolerated the chemotherapy fairly well, and after four cycles of chemotherapy, the tumor shrank, the fluid in her abdomen went away, the thickening of the peritoneal cavity was gone, and her lungs had cleared up. Surgery was recommended.

¶ 31    When Betty had surgery, the tumor could not be seen with the naked eye and therefore the physicians precautionarily removed her uterus, fallopian tubes, ovaries, and the omentum. The pathology revealed a microscopic tumor in the omentum, the ovaries, and on the surface of Betty's uterus and fallopian tubes. Following four more courses of chemotherapy, Betty's CT scans were normal, her tumor marker was back in the normal range, and she was found in remission.

¶ 32    Dr. Smith stated that Betty's remission lasted five months before the cancer returned which Dr. Smith opined was typical in women like Betty who had stage IV ovarian cancer. The bloodwork revealed an increase in the tumor marker. A CT scan revealed that the fluid was coming back and the peritoneal cavity was thickening. Betty was again diagnosed with cancer and additional chemotherapy was started; however, it was ineffective and her CT scans showed worsening. In June 2016 Betty was nauseous, vomiting, and required supplements. By July 2016 Betty's bowels were so badly obstructed that they were not surgically removable. Betty was hospitalized for 23 days. No procedure to empty the fluid worked, so the physicians used a nasal tube to suck out her stomach and started her on IV nutrition. A tube was eventually placed in her abdomen to remove the fluid and additional chemotherapy was tried but unsuccessful. When it

16

became clear that Betty was at the end of her life, she was discharged home at her request, the IV nutrition was stopped, and hospice care began. She died at home two days before her 70th birthday.

¶ 33     Dr. Smith stated that Betty's situation was a very classic history of a woman with advanced stage ovarian cancer. Dr. Smith opined that Betty had a sufficient use of Johnson's Baby Powder to cause cancer and she had the type of cancer caused by talcum powder use. Talc particles were found in her ovary and fallopian tubes and based on the testimony of Betty's sister; the usage was consistent with 2,500 to 3,000 applications of talcum powder on her perineum. Dr. Smith stated that beyond the talc exposure, there was no history of endometriosis, no history of polycystic ovarian disease, no history of obesity and that Betty had a very early menopause at age 42. She also noted that Betty never had a child and she was Caucasian. All were relative risk factors for Betty. Dr. Smith opined that Betty's use of talcum powder was a substantial contributing cause of her ovarian cancer stating that Betty's usage represented sufficient exposure and that talc was found pathologically in Betty's tissue.

¶ 34     On cross-examination, Dr. Smith confirmed that she worked 30 years in gynecologic oncology and reviewed most of the research addressing migration, talcum powder and ovarian cancer that was published during that time. She agreed that during those 30 years, she never asked her patients about their talcum powder use. She also agreed that she never told any of her patients not to use talc for feminine hygiene or recommended more frequent screening based on the usage of talcum powder. She agreed that in the 30 years that she took care of women with gynecological cancer, she never came to the conclusion that talcum powder could cause ovarian cancer. She stated that she did not become firmly convinced that talc was involved in cancer until 2017. Betty's case was the first case where Dr. Smith made a determination that an individual woman's ovarian cancer was caused by feminine use of talcum powder.

¶ 35    Dr. Smith agreed that plaintiff's attorneys paid her to perform the review and provide her opinion. She also agreed that her friend of 40 years, who was also a lawyer, steered her into this case because the friend worked with two of the people trying the case. Dr. Smith was paid $600 an hour for her work. Dr. Smith also recommended that her husband, who also charged $600 per hour, be hired by plaintiff's attorneys, hired her daughter to type the report, and also recommended that plaintiffs use Dr. Saed. She did not know that Dr. Saed prepared a study that was paid for by plaintiff's lawyers and initially stated that there was no financial support for research, authorship, or publication of the article. She agreed that it would be important to know if the authors declared that they received no financial support for authorship of the article and it turned out they were actually paid by plaintiff's lawyers suing J&J. She was surprised to learn that her report prepared for litigation had been sent to Health Canada.

¶ 36    Dr. Smith forgot that she had an original and an amended report in this case. She agreed that her original report was completed in October 2019. Dr. Smith was unaware that plaintiff's lawyers disclosed her as a witness three days after they contacted her about preparing a report. She was also unaware that plaintiff's disclosure indicated what Dr. Smith would say in this case, although she had not yet reviewed the medical records in the case at the time the disclosure was made. Dr. Smith stated that she also relied on the affidavit and deposition testimony of Sharon Carney, who was Betty's sister, in preparing her report. However, the affidavit was also dated after the disclosure of Dr. Smith's opinion in discovery and was also dated after the date of her original report. Defense counsel addressed the interrogatories in which plaintiff provided two time periods regarding powder usage: 1965-1971 and 1996-2002. Dr. Smith was asked if she knew those dates were different from what was alleged when they started the case and she said, "No." Dr. Smith could not remember if anyone told her about Betty's usage when the suit was first filed or if she

18

was provided a copy of the original complaint. She was then shown the original complaint that alleged an entire adult life of exposure to the baby powder. She then reviewed the February 28, 2020, amended complaint that alleged usage through Betty's adolescent and adult life. Dr. Smith said she never saw either document. She agreed the only information she had about Betty's usage at the time her original report was authored was from plaintiff's attorneys.

¶ 37    At this point, the court advised that they were taking a break for lunch and asked the attorneys if there was anything that needed to be addressed once the jury left. No mention was made and no objection was raised related to defense counsel showing or discussing the original and amended complaints with Dr. Smith.

¶ 38    On continued cross-examination, Dr. Smith stated that she believed Betty used the powder regularly and noted that she had talc in her tumors. Dr. Smith disagreed with Dr. Plunkett's opinion that it required a certain amount of usage before there was an increased risk. She stated that only using powder five times would be sufficient for her to conclude that a woman's ovarian cancer was caused by baby powder. Dr. Smith stated that she did not know of any data that supported that opinion. She was aware of the fact that Betty's treating physician, Dr. Hagemann, never told Betty that talc caused her ovarian cancer. She was also aware that Dr. Hagemann provided deposition testimony stating that if Betty were still alive, she would tell her that they did not know what caused her cancer. Dr. Smith agreed that numerous factors related to the cause of ovarian cancer remained unknown but that it was a multifactorial disease, and she identified other risk factors in Betty's case that were also contributory causes. She agreed that Betty's age and race were contributory causes of the cancer. She agreed that even if Betty never used baby powder, she could not opine that Betty would not have gotten ovarian cancer. She disagreed that she did not have information about any other risk but conceded she did not know if Betty used oral contraceptives

19

that would lower the risk of ovarian cancer or if Betty douched regularly which would increase the risk of ovarian cancer.

¶ 39    Dr. Smith agreed that one of the studies she relied on during direct examination actually concluded that chronic inflammation did not play a role in the development of ovarian cancer and opined that it was not one of "the better papers about inflammation in ovarian cancer." She stated that her opinion was based on papers that she thought were the best. She agreed that the FDA determined in 2014 that talcum powder did not cause ovarian cancer and stated that she did not know what the FDA looked at but they did not look at the epidemiology. The FDA determination was shown and Dr. Smith agreed that the FDA critiqued the epidemiology studies. Dr. Smith disagreed with the FDA's assessment of the literature. She also agreed that the National Cancer Institute, that met every month, still had talc on the "unknown if associated" list of potential causes of ovarian cancer, specifically noting a study of a million women where the risk of ovarian cancer was found to be the same between users of talc and never users of talc. She also agreed that the Centers for Disease Control (CDC) published a list of risk factors for ovarian cancer and the use of talc was not included on that list. She stated that the CDC list did not have other known risks like chronic pelvic inflammatory disease or polycystic ovary disease either and stated the CDC list was "not a comprehensive list." Dr. Smith did not know that the CDC recommended use of talc for genital warts; she stated that recommendation was "terrible" and that she would "reach out to them about that." She also agreed that the American College of Obstetrics and Gynecologists (ACOG) of which Dr. Smith was a member, and the Society of Gynecologic Oncology's (SGO) had a list of risk factors that did not include perineal use of talc.

¶ 40    On redirect, Dr. Smith explained the connection with her friend that brought Dr. Smith into the litigation world as well as her husband and daughter's work. Dr. Smith also addressed the

20

timing of when her report in this case was issued, when it was issued in the multidistrict litigation, and what information she had at the time of each. She further stated that the disclosures of Betty's use and Dr. Smith's review of Betty's medical records occurred prior to issuing her opinion. After going through numerous studies, Dr. Smith confirmed that it was her opinion that Betty's use of Johnson's Baby Powder was a cause of her ovarian cancer.

¶ 41    On July 21, 2021, Dr. Steven Mann's video deposition was played for the jury. Dr. Mann worked for J&J before his retirement. He was the associate director of safety and external affairs in 1985 and moved to the position of director of product safety in 1992. In 2001, he was named the director of toxicology for J&J Consumer and Personal Products Company and worked in that position until 2006. In 2001, he was in charge of new product development when the talc issues arose. He stated that he sought experts for guidance, some of whom were former employees that were now consultants of J&J. While working at J&J, he served on a talc task force for the CTFA Talc Safety Committee. J&J also had an internal talc task force.

¶ 42    Dr. Mann sent an email on June 1, 2004, to people at J&J, providing a cornstarch literature update. The email also stated that the NTP was asking for comments regarding their proposal to list talc used in Johnson's Baby Powder as a carcinogen. He agreed that the product was an iconic brand. He sent another email on October 29, 2004, regarding the possibility that the NTP could make an unfavorable ruling that would have a major ripple effect because Johnson's Baby Powder was a primary link to the positive J&J name in the public. He agreed that he stated that they needed to call upon major corporate resources and J&J's power to defend talc from regulation. He disagreed that his job at J&J was to prevent regulation of talc. He stated that it was his job to provide the company with the best science. He agreed that consumers had the right to make informed decisions about their health and safety and that it was important to provide safety or

21

hazard information about J&J products to the consumers. To the best of his knowledge, J&J never placed business concerns over providing safety information to consumers. He agreed that it was J&J's responsibility to ensure that its talc products were not capable of causing cancer. He agreed that there were no studies linking cornstarch to ovarian cancer. He explained that MSDS were required to provide accurate and complete information for workplace safety in product handling.

¶ 43    Dr. Mann agreed that the IARC classified talc as a 2B substance, but stated J&J disagreed with the classification. A 2B substance meant that the talc could possibly cause cancer in humans. He agreed that J&J did not warn its consumers that Johnson's Baby Powder or Shower to Shower could possibly cause cancer when applied to the perineal area of a woman and stated that was because the company did not believe the classification was correct. He agreed that NTP and IARC were reputable organizations, but the company was regulated by the FDA and in 2014, the FDA said it was unnecessary to use a warning label.

¶ 44    Dr. Mann agreed that an email was sent on January 21, 2005, advising of MSDS carcinogenic rating for Johnson's Shower to Shower Shimmer Effects Baby Powder and two Aveeno lip products that would have an "O" classification (suspected carcinogen) on the company list. The email also expressed concern with providing a warning for the new products due to the business outcome it could have. The MSDS listed talc as an "O." A responsive email stated that J&J should not send out any MSDS with that statement on it and discussions would be held to address the MSDS. Dr. Mann agreed the issue was serious but could not recall how the issue ended because it involved both inhalation and perineal use. He agreed that the MSDS from Imerys did include the warning, but he did not agree with putting it on the Johnson product in either the industrial hygiene sheet or the MSDS.

¶ 45    Dr. Mann also addressed the NTP (National Toxicology Program) 12th Report on Carcinogens (RoC) review. He agreed that the NTP was a part of the U.S. government that classified carcinogens or cancer-causing substances. NTP nominated talc for classification during the 12th RoC review. He agreed that his emails with Rich Zazanski (of Imerys) discussed Zazanski's prior attempts to avoid having talc classified as a carcinogen and the active role of the Center for Regulatory Effectiveness (CRE) in diverting the classification. The emails also recommended using experts in the government regulatory process and epidemiology. Zazanski's email also noted that two research groups with NTP voted 13-2 to put talc on the carcinogen list but was deferred in the 10th RoC review. Talc was renominated by the NTP on the 12th RoC report. It was at this point that Dr. Mann sent the October 29, 2004, email requesting corporate resources which included the Dr. Alfred Wehner study as well as 93 documents that had not yet been reviewed by the NTP. He agreed that J&J funded the research. Mann agreed that John Hopkins, who was a former employee of J&J, was one of the world's experts on talc and was also a consultant for J&J. Mann also agreed that Hopkins was paid when he was working as an independent consultant for J&J.

¶ 46    Dr. Mann disagreed that J&J had secret informants at NTP. He agreed that the 12th RoC review deferred on talc and that he sent an email on October 18, 2005, celebrating the withdrawal of the talc nomination. He further agreed that in 2006, the IARC classified talc as a 2B, which meant that talc was possibly carcinogenic in humans. Dr. Mann stated that the IARC decision did not change the company's opinion about the credibility and reputability of IARC, but the company disagreed with the decision because they did not think it was consistent with the data noting numerous flaws in the decision. He agreed that no warning to J&J consumers was issued.

¶ 47    On cross-examination, Dr. Mann explained that when he was at J&J, his focus was on new product development and supporting the teams that created the new products. When safety or toxicology aspects related to the cosmetic products arose, he would seek counsel from an expert. He was not responsible for analytical or quality assurance. The only time he had any responsibilities related to cosmetic talc was from July 2001 to June 2006. After he retired, Dr. Mann did not stay abreast on the issue of talc safety. He agreed that of the major organizations, only IARC classified talc as a carcinogen. The Occupational Safety and Health Administration (OSHA), the American Conference of Governmental Industrial Hygienists (ACGIH), and NTP did not make a similar finding. He confirmed that J&J was relying on both internal and external experts on the issue of whether talc was carcinogenic. Based on his review of the science and the work at the company, Dr. Mann opined that J&J did not believe that the science supported a risk of ovarian cancer with perineal use of talc. He stated that it was his belief that the science showed that Johnson's Baby Powder was not a human carcinogen.

¶ 48    On redirect, Dr. Mann agreed that IARC concluded that ovarian cancer was a possible health hazard associated with the use of genital talc. He agreed that J&J never passed on information related to the possible health hazard to the public. No warning was issued because they did not feel it was necessary. He agreed that Johnson's Baby Powder and Shower to Shower products were removed from the market in the U.S. and Canada. He continued to believe that talc did not cause cancer and used the product himself and so did his daughters. He disagreed with the organizations that said differently.

¶ 49    The video deposition of Dr. Andrea Hagemann, Betty's treating obstetrics and gynecologist physician, was played for the jury. Dr. Hagemann stated that Betty was initially admitted in February 2015 to Barnes Jewish Hospital for shortness of breath, abdominal pain and a failure to

24

thrive. After workup and CT scan, she was found to have a pleural effusion and pulmonary embolisms which explained the shortness of breath. Thoracentesis and paracentesis removed 470 milliliters of fluid and 1,920 milliliters, respectively. After further workup, Dr. Hagemann was consulted because the pleural effusion tested positive for malignancy and Betty's CT scan showed ovarian masses. The biopsy subsequently showed adenocarcinoma likely of Mullerian origin and Betty was diagnosed with stage IV ovarian cancer. Betty was not able to tolerate surgery based on her current physical condition, so chemotherapy was started. After three months of chemotherapy, Betty was doing much better. The disease responded well to the chemotherapy, and a total abdominal hysterectomy was performed on June 23, 2015, which removed her uterus, the omentum, her Fallopian tubes and ovaries. The removed organs were sent to pathology to determine the treatment response by the cells to the chemotherapy and to determine if the cancer cells were still active. The pathologic diagnosis found serous carcinoma which Dr. Hagemann interpreted as involving the right fallopian tube and both ovaries. She agreed that adhesions were seen in the pathology report but believed the findings were from the chemotherapy. She further opined that Betty's cancer originated in her fallopian tube.

¶ 50    Following surgery, Betty was taken to the intensive care unit (ICU). The chief complaint listed exacerbated congestive heart failure (CHF). Dr. Hagemann testified that in her opinion, the exacerbation was from the surgery, although she agreed it could have worsened from the chemotherapy and the cancer.

¶ 51    Dr. Hagemann testified that Betty was 68 years old with stage IV ovarian cancer. She explained that stage IV signified that it was either in the liver or the lung. The staging was a description of the degree of metastasis from the ovary or fallopian tube. In this case, the stage IV referred to the pleural effusion and the ovarian cancer cells identified in the fluid of the lungs. She

25

stated that Betty did not have liver cancer. Betty was discharged from the ICU on June 28, 2015, and underwent three or four more cycles of chemotherapy. She had a CT scan after the cycles that showed no evidence of the disease. Her physical symptoms improved, and she enjoyed a good quality of life. She loved to play golf and spend time with her friends and that was what she did after she completed her chemotherapy.

¶ 52    Thereafter, they went into surveillance mode and Betty would return every few months to check on labs and her symptoms. Betty developed a recurrence in February 2016. She then completed seven three-week cycles of chemotherapy. Betty was nauseous, vomiting, and not eating by July 5, 2016. Her medical history included information that her father had lung cancer. Both he and Betty were smokers. Dr. Hagemann did not believe that Betty's smoking had anything to do with her ovarian cancer.

¶ 53    When Betty was admitted on July 5, 2016, she had a recurrence in her abdominal cavity, which caused a bowel obstruction which was a common recurrence with ovarian cancer. Betty was given IV fluids and a nasogastric tube (NG tube) to suck out the material in the bowel. She agreed that stage IV serous ovarian cancer recurred approximately 80% of the time and that less than 50% of the people with the condition lived five years after the diagnosis. The NG tube was unsuccessful, and a tunneled peritoneal catheter was inserted. Betty was in the hospital for over a month trying to resolve the bowel problem. On July 26, 2016, approximately 4,000 cc's of fluid was drained in a procedure, and they also found widely disseminated plaque-like ovarian cancer covering all the surfaces of the abdomen. Dr. Hagemann stated that Betty wanted quality of life and did not want to live at the hospital. Betty was discharged on July 29, 2016, and was happy to go home.

¶ 54    Dr. Hagemann and Betty discussed more chemotherapy, which Betty agreed to do; however, she stated that if it did not work, she did not want to keep doing it. On August 23, 2016,

26

Betty was admitted into hospice care. At that point, Dr. Hagemann relinquished care to hospice. She explained that Betty understood that the risks of future treatment outweighed the benefits. Hospice care was about making the patient comfortable. Betty left the palliative care facility and passed away at home on September 4, 2016. Dr. Hagemann opined that Betty's cause of death was ovarian cancer and sequelae of her conditions that arose from it.

¶ 55    Before the deposition, Dr. Hagemann and her personal lawyer told counsel for both parties that she had no intention of offering opinions regarding whether talcum powder caused or contributed to ovarian cancer because she was not an expert in that situation. She stated that she was well-educated about the etiology of ovarian cancer. Dr. Hagemann agreed that she was affiliated with Siteman Cancer Center and was provided a copy of a document from its website discussing ovarian cancer. She agreed that the website included a prevention section for ovarian cancer that included an avoidance of talcum powder.

¶ 56    On cross-examination, Dr. Hagemann stated that she was not aware of the allegations in this case when she was treating Betty; she found out when her deposition was taken. She was unaware that Betty's relatives alleged that Betty used Johnson's Baby Powder and Shower to Shower and that the powder caused her ovarian cancer. Dr. Hagemann was aware of the underlying issue now but did not know what products Betty used. She stated that, based on her memory, Betty never mentioned any products to her and Dr. Hagemann did not remember ever talking to Betty about talc use. Dr. Hagemann never told Betty that her ovarian cancer was caused by using talc. Nor did Dr. Hagemann tell any of her patients that talc caused their ovarian cancer. She only spoke about talc if a patient raised the issue. She discussed the factors that increased the risk of ovarian cancer with her patients. These included lengthy menstrual cycles, the length of time women had

27

menstruation, and not having children. She also discussed the decreased risk with having children, breastfeeding, or being on oral contraceptives.

¶ 57    Dr. Hagemann stated that genetics also played a part and could cause the mutations in the fallopian tube and ovary cells that would become cancerous. Betty never had any genetic testing and there was no family history of ovarian or breast cancer. Dr. Hagemann stated that the median age of onset for ovarian cancer was 62. Betty was 68. The most common type of ovarian cancer was exactly what Betty had. She was unaware of any foreign particles identified in Betty's pathology. She stated that Dr. Graham Colditz was the person who handled the Siteman Cancer Center website, and she knew that he was a plaintiff's expert in other talc litigation. She agreed that neither the Society of Gynecologic Oncology (SGO), of which she was a member, nor the National Cancer Institute included talcum powder as a risk on their websites. She opined that if Betty was there to ask her what she believed caused the ovarian cancer, she would not be able to say. She did not know about talc. She agreed there were newer studies that were speculative, but she "would not say that that alone caused her ovarian cancer."

¶ 58    On redirect, she stated that the claim of inflammation causing cancer was also speculative. She thought it was more likely in the genetic happenings of cancer but agreed it was a well-accepted theory as to the etiology of epithelial ovarian cancer and serous cancer specifically. She was not aware that talc particles were found in the tissue by a different pathologist.

¶ 59    On July 22, 2021, Susan Nettesheim's video deposition was played for the jury. Susan was the former vice president of toxicology and product stewardship for J&J. She agreed that product stewardship was effectively managing ingredient issues including safety, regulatory, stakeholder, and media for non-drug ingredients. She agreed that J&J's products included cosmetic powders and that the primary ingredient in Johnson's Baby Powder and Shower to Shower was talc. She

28

denied responsibility for the safety of those products; that responsibility belonged to the safety and toxicology teams who looked at safety around the world. Once the product was launched, that group again was responsible for tracking the issues. The R&D groups would look at the data and make determinations on the implications of that data. Susan's responsibilities involved managing the issues associated with the safety of talc, not managing the safety of talc. Any product that posed a real risk would never be marketed.

¶ 60    Susan testified that when tracking major global regulatory authorities, she would rely on the Cosmetic Ingredient Review board (CIR), FDA, Environmental Protection Agency (EPA), EU directive, or the Scientific Committee on Consumer Safety (SCCS) requirements globally. She would also review information from authoritative bodies that included the IARC, the NTP, and Prop 65 in California among others. She agreed that IARC was a highly respected body of scientific cancer researchers around the world and that in 2006, they identified talc as a substance that was possibly carcinogenic to humans. She agreed that if there was a scientifically supported safety concern with a J&J product or ingredient, they would end that product or ingredient. Possibilities were not enough; it had to be a certainty or at least the totality of the evidence supporting the fact or a statistically significant causal association. If it was a real health hazard, there would be no warning; the product would be pulled from the market.

¶ 61    On cross-examination, Susan explained that it was unnecessary for her to be an expert in toxicology as long as there are experts involved in the decision making. She disagreed that one study could definitively determine a causal relationship between talc and ovarian cancer and would not rely on one study to take a product off the market. She explained that weight of the evidence meant looking at all the scientific data available. She would rely on the safety, clinical, and quality

29

team decisions. At the time she left J&J, the preponderance of the data and the best studies did not show a causal relationship between the use of talc and ovarian cancer, including the FDA.

¶ 62    A video deposition of Tina French was played for the jury. Tina, an attorney, was the assistant corporate secretary of J&J. She confirmed that J&J was governed by the board of directors who were responsible for the oversight of the operations representing the shareholders. She agreed that the company values stated that the company's first responsibility was to the doctors, patients, mothers, fathers, and nurses, who used J&J products. Tina agreed that talc was an ingredient in Johnson's Baby Powder and other cosmetic products.

¶ 63    John Hopkins previously provided deposition testimony in July 2019, and a brief portion of that deposition was read to the jury. John Hopkins was a corporate representative of J&J. He confirmed that the baby products company, that included Johnson's Baby Powder was a division of the overall company until 1978. At that time, the baby products company became a subsidiary of J&J which was named Johnson & Johnson Consumer, Inc. or JJCI.

¶ 64    Sharon Carney testified that Betty was her older sister. She identified photographs of Betty and her siblings. She did not know of anyone in the family who had ovarian cancer prior to Betty. She stated that Betty was very active playing tennis, golf and volleyball. Betty also liked going on 50-mile bike rides, boating on the river, walking with friends, and participating in archery. Betty was never married and never had any children. She stated that Betty was a private person and did not share her life. Sharon did not know Betty had ovarian cancer until after she passed. They did not even know when Betty was hospitalized.

¶ 65    Sharon testified that she and Betty shared a bedroom from 1966 until June 1970. Sharon was 12 years old at the time and Betty was 19 years old. Sharon saw Johnson's Baby Powder containers in the bedroom she shared with Betty. Sharon was also using the product. Sharon stated

30

that Betty showered every day and would apply the powder in the bedroom. Betty would wear a white robe, turn her back toward Sharon, and apply the powder to her chest and genital area. Sharon used the powder the same way. She did not see any other brands of powder on the dresser. She explained that Betty purchased the powder herself because their mother only purchased necessities like shampoo, soap, and band aids. The powder would have been considered a luxury item. She stated that the blue carpet in the bedroom was sprinkled with powder. In 1970, Sharon moved to a different bedroom in the house. She stated that the powder residue remained on the carpet even after Sharon moved into a different room. Sharon also noted white powder in Betty's underwear.

¶ 66    Sharon moved to Colorado in 1973 and had no reason to believe Betty stopped using the powder when she moved away. Sharon moved back to Illinois in 1975 and would see Betty about twice a week. Sharon was a divorced mother of two. Betty was a support system for Sharon and her children. Sharon only found out that Betty was ill when her son, Jesse Carney, was asked to move a package for Betty from the porch, after getting permission from his boss, John Driscoll, to go. Afterwards, he told Sharon that Betty was on a feeding tube. Jesse stayed with Betty until Betty passed away on September 4, 2016. She discussed the loss of Betty to her and the family.

¶ 67    On cross-examination Sharon testified that Colleen Cadigan, the person who brought the suit, was Sharon's niece. Jesse was Sharon's son and John Driscoll was her nephew. Sharon agreed that her address was connected to the Driscoll Law Firm and that she was the registered agent for the law firm. Jesse also worked at that law firm out of the Puerto Rico office. She agreed that in her prior deposition that she stated that she only actually saw Betty applying baby powder from 1966 to 1970. She agreed that she never saw Betty apply the powder after that time.

¶ 68    Sharon stated that she would get up at 7 or 7:15 a.m. for school and Betty would already be gone from the house by the time Sharon got up. She stated that she would lie in bed and watch

31

Betty use the baby powder. She clarified that "getting up" meant getting out of bed or getting ready for the day. She did not watch Betty get dressed; she only watched Betty use the powder. Sharon stated that she could still see Betty using the product even though she was wearing a robe because she could see Betty's arm moving. She did not see what Betty did with the powder after she shook it out of the container. Sharon could only see the shaking.

¶ 69    Sharon agreed that she prepared an affidavit in the case and was approached by her nephew John. The affidavit stated that she had personal knowledge of Betty's use and purchase of Johnson's Baby Powder. She agreed that she was never at the store when Betty purchased the powder. She agreed that the use of the date 1965 in her affidavit was erroneous and should state 1966. She did not know when the lawsuit was filed or that her affidavit was signed and dated a year after the lawsuit was initially filed. She did know when she was asked about Betty's baby powder use. She stated that she may have been asked to sign an affidavit a year earlier but did not sign it until October 18, 2019, almost two years after the case was filed. She agreed that there were warnings on the cigarettes she smoked but they did not stop her from smoking the cigarettes and she was sure Betty saw them too.

¶ 70    Sharon stated that she did not recall her sister ever using Shower to Shower. She had no idea why the initial complaint said Betty was using that product. She did not know that J&J had a brand of baby powder that was cornstarch in a bottle similar to that used for the Johnson's Baby Powder. She did not know for sure if Betty was using talcum powder or cornstarch. Sharon did not attend any of Betty's chemotherapy sessions or have any conversation with Betty about her ovarian cancer. In 2015, Betty told everyone in a group text that she had stomach cancer and was going through chemotherapy. Sharon never spoke to any of Betty's physicians, so she never asked them what might have caused Betty's cancer.

¶ 71    Jesse Carney testified that he lived in San Juan, Puerto Rico. He was the human resources director and office manager of Driscoll's Puerto Rico law office. In 2013, he went to work for John Driscoll. Jesse was one of Betty's nephews. His mother was Sharon Carney. He stated that Betty was like a second mother to him. He identified family photographs and discussed events and outings he took with Betty. She doted on her nieces and nephews, but Jesse was her favorite. Jesse stated that he did not know Betty had ovarian cancer until after Betty passed away. He thought she had stomach cancer. Jesse had no knowledge of Betty's use of Johnson's Baby Powder. However, he stated that he did observe Johnson's Baby Powder containers in the restroom under the sink when he visited Betty. He stated that he would clean Betty's house and would see powder on the floor when he was vacuuming. He also saw Betty purchasing the product once in 1998 from a Walgreens. He stated that he did not think Betty would have used the product if there had been a warning of an increased risk of getting ovarian cancer.

¶ 72    Jesse testified that when he went over to Betty's to move a package of medication left on the porch into the house that Betty no longer looked the same. He said she was "like a skeleton" and "looked like she was dead already." He stated that Betty had no hair when he saw her in August 2016. Bile would come out of her mouth because she had a tube that would pump it out of her stomach. She also had a colostomy bag, a catheter, a nasal cannula for oxygen, and a port for her chemotherapy that was later used for her nutrition. He stated that Betty would take morphine pills and used a fentanyl patch. She took Lorazepam and Ativan for anxiety and Zofran for anti-nausea. Despite the medication, Betty remained in pain. Eventually Betty told the hospital that she did not want to pursue any life-sustaining treatment or return to the hospital. The only thing Betty could ingest was ice chips. He stated that numerous people came to visit in the last 24 hours of her life. In the last month of her life, Betty would lie in her bed and scream with pain.

33

¶ 73    On cross-examination, Jesse stated that he had no opinion on what might have caused Betty's ovarian cancer. He was unaware of any of Betty's doctors who recommended that the lawsuit be filed. He never spoke to Betty about her use of talcum powder. He agreed Betty was a very private person. She never told him or the family to pursue a lawsuit. She never asked for an investigation into the cause of her illness. Jesse testified that his cousin, John, was the one who told him about the lawsuit. Betty never told him before she passed away that she thought talcum powder had anything to do with her ovarian cancer. Jesse was shown the complaint in the case, and he agreed the plaintiff's attorney was his cousin, John, who owned the Driscoll Law Firm where he worked in Puerto Rico. He agreed that Colleen Cadagin, who was the executrix of Betty's estate, was his cousin. Jesse was asked about the complaint filed in 2018 that indicated Betty regularly and habitually throughout her adult life used talcum powder products in her perineal area and stated he never saw her use talcum powder products. He did not know where the information for the original complaint came from and had never seen the complaint. He did not know how the information was gathered and did not take part in writing that or anything else. He agreed the original complaint had an allegation that products were purchased from Walgreens but did not know that his cousins also had a lawsuit against Walgreens in connection with Betty's death. He agreed that he previously testified to seeing Betty purchase talc at Walgreens in 1998.

¶ 74    The court asked to take a break and asked defense counsel why she was talking about the case against Walgreens. Counsel explained that there were very few fact witnesses and examination of their testimony was required given the differences between the original and the final complaint. She stated she was exploring what the witnesses knew about the allegations made in the case. The court reprimanded counsel for using the complaint listing other defendants who had been severed from the case. Counsel for plaintiff then complained that defense counsel's

34

reference to the Walgreens lawsuit was "out of bounds." Defense counsel argued that the interrogatories responses listed Sharon Carney and Jesse Carney as the people who would discuss usage. The court allowed counsel to make a record but said "move on." The court said it believed they "should instruct the jury to disregard the Walgreens stuff." Plaintiff's counsel agreed. The court also had issues with medical records being on the screen that included Medicare information and said that needed to stop too.

¶ 75    Defendants' counsel then asked to be heard on the Walgreens issue, stating that plaintiff sued them and Imerys and they were both severed but the cases remained pending. Counsel noted that no motion *in limine* was sought to exclude any reference to the severance or the pending case. She stated that it was included in her opening and there was no objection. Ten days into the trial and no one said anything about it. No motions were filed and there was no direction from the court not to reference it. She stated that Jesse was the witness who identified the Walgreens purchase and it was directly relevant to the statements in the interrogatories and the pleadings in this case.

¶ 76    The court responded, "What about relevance? That's a basis. I don't see *** any reason why it's relevant." Counsel stated that she was entitled to explore what the witness knew and how that matched up with what was alleged or not alleged in the case. The court noted that the witness did not prepare the pleadings. Counsel argued that Jesse was "identified by these lawyers as having the information." Defense counsel again noted there was no objection or motion and stated the court was injecting itself into the proceedings. Counsel was cut off and the court stated that plaintiff's counsel "motioned." Plaintiff's counsel then stated, "I object. And you did hear that." The court responded, "No. And I saw him. He was *** indicating in his seat *** which is why we took the break."

35

¶ 77    Plaintiff's counsel then complained that defense counsel would say something objectionable, then say they would come back to it later, and then abandon the topic after "she's dropped the poison *** in the box." Defense counsel responded that plaintiff's counsel "should stand up and object" but plaintiff's counsel said, "Well that's just what you want me to do because you want me to look like I'm trying to stand ***." The court cut him off. Defense counsel stated she was going to address the allegations in the complaint. When the jury returned the court stated,

> "Before we start *** First of all, the jury is instructed to disregard any
> mention of any other possible other lawsuit, or any of that. And that will be stricken
> from the record. So just it did not—You have to act like it was not even presented
> and it is erased from your mind. Okay?"

After the statement was issued, defense counsel moved for a mistrial based on the instruction. The motion was denied.

¶ 78    Jesse's cross-examination continued and he confirmed that he had no information about Betty's use of talcum powder from 1966 to 1970 or from 1996 to 2002. He did have a memory of Betty making a purchase one time at Walgreens. That was the only time he saw her purchasing it. He was 14 years old at the time. He agreed that when he was vacuuming Betty's room, he did not know with certainty that the product on the floor was baby powder. The only time he saw Betty use the baby powder was on a family member's child. He did not know if Betty spoke with her physicians about her talc use.

¶ 79    Maureen Driscoll, Betty's sister, testified that she entered the School Sisters of Notre Dame in 1958 and professed vows in 1960. She was 80 years old at the time of the trial. Maureen had no information about Betty's talcum powder usage. She stated that Betty was the matriarch of the family. She stated that Betty bought their mother a home and before that, helped their mother with

the rent. Betty would take her nieces and nephews on outings and trips. Maureen did not know that Betty had ovarian cancer until she passed away. She stated that Betty was very private and looked after everyone else. She did not know that Betty was hospitalized from July 6, 2016, to July 27, 2016. She went over to the house before Betty died but did not go in to see her. She stated that the family continued to grieve for Betty.

¶ 80    Following Maureen's testimony, a stipulation was read to the jury that stated Betty's medical treatment for ovarian cancer was $485,361.85. The stipulation further stated that J&J believed that Johnson's Baby Powder was safe and did not cause or contribute to Betty's ovarian cancer or death. The jury was told to bring masks for the following day and was released.

¶ 81    The trial resumed on July 23, 2021. The court expressed its anger about defendants "going over a complaint with a lay witness who has never seen it [and] ha[d] no knowledge of it." It called the action "so far out of bounds in the three states I'm licensed in that I can't conceive it. I really can't. I have trouble with it." Thereafter, the court claimed that one of the J&J attorneys thought the court was "stupid" and threatened to revoke her 707-status stating, "The State's Attorney's office is in here and I will proceed with contempt hearing if we need to. Don't do it. Tread lightly." The court further stated that it had "the inherent authority to control the trial in Courtroom 401. I've always had it. While Mr. Meadows [plaintiff's attorney] motioned me yesterday, if I want to *sua sponte* keep out irrelevant evidence, prejudicial *** evidence, and move the trial along, I have that ability. Don't question it." The court continued stating that it found the behavior "insulting to the trial court." Once the jury was brought in, plaintiff confirmed that it was resting.

¶ 82    Defendants called Dr. Susan Nicholson to testify. Dr. Nicholson provided direct examination for 2 hours and 24 minutes. After the jury was released to lunch, the court asked plaintiff's counsel how much cross-examination was expected. Plaintiff's counsel said it would be

37

all afternoon and maybe into Monday. The court announced it would end the day at 3:30 p.m. Plaintiff's counsel stated that she could not imagine two hours being sufficient. Defense counsel asked if they could try to push through. Following the lunch break, defense counsel advised the court that Dr. Nicholson was happy to stay here for as long as it took to finish her testimony that day, but due to personal conflicts, she would not be able to return the following week. The court stated that, "She better change those." Defense counsel again stated that Dr. Nicholson was unavailable the following week. The court asked, "Why?" and stated,

"I need to know the reasons why. And it better be real good, because—The only thing I can think is there's going to be a limiting instruction or something is probably the only way to cure that. I mean I can point to other things where—where we could have put her on—where we would have been ahead of schedule for a couple of things. But I think you guys need to have a very frank discussion with her and maybe whoever her boss is because I don't—I'm not sure what the remedy— what other remedies there are."

¶ 83    The court then brought Dr. Nicholson back up to the stand and told her that she would have to be there on Monday or he would put her in "county housing." The witness was unable to provide a response to when she could return to finish her testimony. The court stated that it had two options: (1) holding her in contempt by ordering her to be there on Monday or (2) keeping her in the county. Dr. Nicholson stated she could appear on Thursday. Plaintiff's attorney stated the trial would be done by Thursday and alleged that defense counsel was trying to "jam us up because we're supposed to start another trial." Defense counsel disagreed with that classification and stated she had been transparent about the witnesses. The court stated, "But we weren't told about her unavailability for next week until just now." Plaintiff's counsel agreed saying, "That's right." The

38

court asked Dr. Nicholson to explain her commitment in a whisper. Following the conversation, the court stated, "I think we have resolved the issue. And Dr. Nicholson will be here on Monday morning." The jury was reconvened at 1:38 p.m. and cross-examination began. At 3:25 p.m., court ended for the day and excused the jury. Defense counsel asked if the court would allow Dr. Nicholson to appear virtually. The court denied the request, stating she "can be here in person."

¶ 84      Court resumed on July 26, 2021, and Dr. Nicholson did not appear. Plaintiff requested all of the statements to be on the record as to why Dr. Nicholson did not appear and claimed the witness did the same in a different case. Plaintiff's counsel stated, "As so we—we would like all of this to be on the record and once Your Honor invites us. We have—we want to make a motion as to what the remedies would be." The court asked what plaintiff was seeking and said, "I mean off the top of my head, there'd be two remedies: A 5.01 instruction, and striking of the testimony." Plaintiff's counsel responded, "I mean, what we would seek, number one, that she be held in contempt, and the order be issued, because she's violated an order in this court." The court inquired if J&J should be held in contempt, and plaintiff's counsel, Ms. O'Dell, stated "Susan Nicholson personally. *** She went into specific issues that I believe the evidence will show she misled the jury. And I'm prevented from inquiring about that. And I can go through those and specifically outline them, Your Honor." The court inquired into the sanction for holding Dr. Nicholson in contempt and plaintiff's counsel replied,

> "The sanction, Your Honor, is that Dr. Kuffner would not be allowed to testify. He's the other corporate witness. Basically what we're seeing this morning, is we're having, you know, Corporate Witness No. 2. Corporate Witness No. 1, you know, testified, and we're not allowed to cross-examine her. Now they're rebooting

39

with Corporate Witness No. 2. We move that Dr. Kuffner would not be allowed to testify.

Secondly,—or thirdly, Dr. Osann is their expert epidemiologist who would be put on to basically retread ground that Dr. Nicholson covered on her direct in regard to a general causation. We would move that she would be struck as a witness and not be allowed to testify.

And then as to Dr. Nicholson, and I forgot to mention this in relation to her, there are specific things that we would have covered on cross-examination, and we would like the opportunity to make a proffer to the jury, so that those things do not stand unchallenged."

¶ 85    A second plaintiff's attorney, Mr. Meadows, stated, "Your Honor, I think one other thing is, we'd like to seek—we'd like to seek a striking of their defenses in this case. And with respect to the contempt order, we'd want the jury to know about that."

¶ 86    Defense counsel asked if she could explain the situation with Dr. Nicholson and asked if it could be under seal since it revealed personal medical conditions and mental health that would explain why Dr. Nicholson could not be in court that day. Counsel continued by stating that

"the situation with Covid, Your Honor, right now, has exacerbated a prior medical condition that I need to reveal to the Court under seal because it's personal, medical information about Dr. Nicholson. It's why she is in the care of a doctor this morning. It is why she is unable to come back here."

The court stated, "She looked pretty healthy when she left here." After continued attempts to submit documentation, the court made it clear it did not believe any excuse and stated there had "to be a remedy for her not being here." The court stated it knew all along that Dr. Nicholson

40

would not be there. When defendant's counsel stated that they had every expectation that she would return, and discussed the flights, she again requested that they submit an affidavit under seal. The court responded, "I'm sure she's too sick to sign an affidavit." The court eventually took a break.

¶ 87 When the court returned, it advised defense counsel that she could submit something under seal. It then found J&J and Dr. Nicholson in contempt but would "take any sanctions under that, under advisement." It further stated, "The Court will issue a 5.01 missing witness instruction, and is going to strike the testimony of Dr. Nicholson. And I'll ask the jury to disregard that, as well." The court stated that it would allow Dr. Kuffner to testify and was not striking defenses at that time and asked plaintiff's counsel if it wished to explain to the jury about their planned cross-examination. Plaintiff's counsel said, "Yes." And the court said, "Granted." The court advised the parties that, "As far as the 5.01 reading goes, I'm going to tell the jury that Dr. Nicholson refused to appear to finish her cross-examination. And there will be a further instruction on it. I think we need to work on 5.01 language." Defense counsel requested that the court advise the jury that Dr. Nicholson was not appearing due to a medical condition, but the request was denied.

¶ 88 The trial resumed. When the jury returned, the court stated,

"Dr. Nicholson has refused to appear for cross examination. So I want—you will be further instructed on that. But—at this moment in time, her testimony on direct and the earlier—is stricken. And you are to not consider it, and wipe it out as if it never happened."

The court then advised the jury that J&J and Dr. Nicholson were held in contempt and granted plaintiff's counsel the opportunity to present to the jury what further cross-examination would

41

have been done but counsel was not ready. The court stated it could be done later and directed J&J to call its next witness.

¶ 89    Colleen Cadigan, the executor of Betty's estate, Betty's aunt, and an attorney, testified that she never lived with Betty. Colleen stated that she had no personal knowledge about Betty's use of Johnson's Baby Powder. She never saw Betty use it, purchase it, and also never saw the product in Betty's home. She never went to Betty's house after Betty died. She stated that she decided to bring the lawsuit after having a conversation with the Driscoll Law Firm and her cousin, John Driscoll. The decision was made after the death certificate was issued approximately four to six months after Betty died. Colleen only talked to John. She did not talk to any of Betty's physicians or any doctor about anything to do with Betty. She did not review the complaint before it was filed and never saw anyone's affidavit. She did not know the source of any of the information in the complaint but stated it did not come from her. She did not review any of the medical records.

¶ 90    On cross-examination, Colleen stated there was an unwritten agreement not to discuss Betty's cancer situation. Betty's body was donated to the Washington University School of Medicine. She agreed that Betty was a private, independent, and opinionated person. She also told a few stories about Betty and her nieces and nephews.

¶ 91    On redirect examination, Colleen stated that the beneficiaries of the estate would receive any funds awarded. Except for the one child receiving Social Security, all the nieces and nephews, including John Driscoll, would receive a portion of the proceeds.

¶ 92    Following Colleen's testimony, plaintiff requested a motion *in limine* disallowing the next expert from repeating anything that Dr. Nicholson previously stated since Dr. Nicholson's testimony was stricken. The court stated it would wait to rule on that motion and told counsel to make an appropriate objection if one was necessary. Defense counsel objected to the instruction

42

given to the jury regarding Dr. Nicholson's refusal to appear and telling the jury that both Dr. Nicholson and J&J were held in contempt. In support, defense counsel relied on her affidavit which addressed Dr. Nicholson's medical condition. The court stated that it did not believe the affidavit because it was not credible. Counsel also asked if they would be allowed to address the proposed cross-examination that would be presented to the jury. The court stated it would be addressed later.

¶ 93    Dr. Ed Kuffner, board certified in both emergency medicine and medical toxicology, testified on July 26, 2021, that he previously worked for J&J. He started working with Tylenol and moved on to Motrin, Benadryl, Sudafed, Zyrtec and the over the counter (OTC) medicines made by J&J. He later took on more safety responsibilities and headed up the toxicology group at J&J. Thereafter, he became a vice president of regulatory affairs for Europe and after two years, became the chief medical officer for J&J, which was the lead physician when it came to safety. He started that position in 2017 and continued to work in that position at the time of the trial.

¶ 94    Dr. Kuffner stated it was his job as the chief medical officer to protect patients and consumers of J&J products. J&J monitored the literature and adverse events as a team. The quality team ensured they were using the right procedures and processes to put out quality products. The toxicology group looked at data, performed research, and evaluated the outside research. The regulatory team were experts on the regulations. They had people in the advertising group making sure the advertising was correct and people in the analytical group testing the products to ensure quality. They used a team approach to make sure the products, including baby powder, were safe.

¶ 95    Dr. Kuffner testified that when he was chief medical officer, he requested a comprehensive review of talc to determine its safety after Health Canada issued a report stating there was a potential link between talc and ovarian cancer. He told the team he did not care what the result was, he wanted to know the science including animal and human studies. He then prepared a report

43

based on the assessment of the epidemiology, toxicology, regulatory, and the analytical teams, and submitted it to J&J. The report was comprised of over 4,800 pages reviewed, 2,000 studies about talc, and was 253 pages long. The genotoxicity studies revealed that talc did not alter the DNA of the cells. Further, neither the animal studies nor the human studies, revealed a risk of ovarian cancer. Even the women who used diaphragms and condoms that had talc did not show a risk of ovarian cancer. None of the studies showed a risk or health ratio of 2.0, which was what was needed for association between the product and cancer. If it was a 1.0, there was no difference. He stated that if there was an unmitigable risk in a product, they would not be selling the product. He also reviewed the talc pleurodesis studies and explained that when a lung collapsed, talc was injected into the lung to close off the fluid. He stated that none of the people with talc injected into their lungs had cancer. He agreed that some of the perineal use studies claimed that there was a risk and stated that no warning was put on the product because science did not support the suggestion that talc caused ovarian cancer.

¶ 96    On cross-examination, Dr. Kuffner stated that he had never studied the particle size used in talc pleurodesis. He was told that the particle size for the procedure was much larger and that was what caused the inflammation that would lead to the scarring to stop the fluid. He disagreed that when things went badly at J&J, he was sent in to fix it. He further disagreed that, after his review of the Health Canada report, he assembled a "global media team." He stated that he assembled a team of scientists to look at the issue. He was provided a copy of a "Negative Event Communications Guide" that was in his email in 2016. He did not remember the email. Plaintiff's counsel went through all the steps of the guide.

¶ 97    A break was taken for lunch. Following a contempt proceeding related to someone trying to talk to the jury, the court asked if either J&J or Dr. Nicholson would be making a statement in

44

allocution. J&J said it would and asked for additional time to determine what occurred at Dr. Nicholson's doctor's appointment that day. The court again said it did not find that excuse credible and further stated that it would not believe any physician's note either. The court stated that it did not believe Dr. Nicholson on Friday and did not believe her now.

¶ 98    When the jury returned, the parties returned to Dr. Kuffner's cross-examination and the global media slide which plaintiff's counsel stated was "textbook PR" and was used to divert attention away from the crisis issue. Plaintiff's counsel also addressed two cohort studies including the Nurse's Health Study from 2009 that was originally used to determine breast cancer, coronary heart disease, colon cancer, hip fractures, cognitive function, and eye disease. Dr. Kuffner explained that talc questions were added later. Counsel also addressed studies by Cramer which found statistically significant causal association between genital talc use and ovarian cancer. Dr. Kuffner disputed plaintiff's statement explaining that a risk of 2.0 was required. Plaintiff's counsel also addressed the Women's Health Initiative cohort study which also did not start out as a study for talc and ovarian cancer. Plaintiff's counsel addressed the Health Canada report which also found a risk between talc and ovarian cancer. Dr. Kuffner agreed that his report, which was completed in 2020, was sent to Health Canada in response to the initial report. Dr. Kuffner agreed that there were limitations in the cohort studies but continued to opine that it was the best evidence and that evidence failed to show a causal connection between talc and ovarian cancer.

¶ 99    During the next break, the parties talked about the remaining witnesses as well as rebuttal witnesses. Defense counsel objected to allowing plaintiff to present a proffer on what it would have said on cross-examination since the testimony was already stricken. The court took the matter under advisement and stated that a 5.01 instruction would be issued. Defense counsel objected to

that instruction because the instruction required a finding of bad faith and Dr. Nicholson's absence was due to a medical reason. The court disagreed, stating,

> "As I've told you, just to make the record clear, also, I didn't find her credible. She was lying to me. She was lying to me on Friday. And I think she's lying to me today—or lying to you, whatever. I think, that she is now putting other misrepresentation on the Court. The excuses given in her—in your affidavit for health, I am—maybe she should consider a new job, and not showing up to offer testimony."

¶ 100 On redirect, Dr. Kuffner agreed that the letter that went with his report to Canada Health stated that the product was removed due to declining sales due to misinformation around the safety of the product and a barrage of litigation advertising. The letter stated that the company continued to remain confident in the safety of talc-based Johnson's Baby Powder. He stated that the groups considered over 2,000 studies when he made the report. Following Dr. Kuffner's testimony, court ended for the day.

¶ 101 On July 27, 2021, the trial court started by telling the parties that allowing plaintiff to provide a proffer was still under advisement. The court stated that it believed plaintiff should do so outside the presence of the jury. As to the affidavit filed by defense counsel, it was stricken as being inadmissible hearsay and if Dr. Nicholson personally prepared an affidavit, it would also be stricken for hearsay. Defense counsel again requested the court not instruct the jury that Dr. Nicholson refused to show up without addressing the medical issue. The court stated it would take the matter under advisement.

¶ 102 Dr. Kathryn Osann, who had a PhD in epidemiology, testified on July 27, 2021. She explained that epidemiology was the study of the distribution of disease in populations. She agreed

46

there were quite a few epidemiology studies regarding the association between talc for feminine hygiene and ovarian cancer. She agreed that some of her own published research included gynecologic cancers. She was currently involved in a study of ovarian cancer addressing why some women were able to survive longer after having the disease. She stated that because they did not know the cause of ovarian cancer, they could not prevent the disease and therefore, she was focused on survival.

¶ 103   Dr. Osann testified that she spent the last five years looking at baby powder and ovarian cancer for J&J. She did not believe that baby powder was the cause of the ovarian cancer. She stated that when all the studies were viewed together, they did not support a causal association between perineal use of baby powder and ovarian cancer. The association was weak and so small that it could be explained by bias or confounding, rather than being a true effect. She addressed both the case-control and the cohort studies, which she stated revealed inconsistent results. She further found non-existent dose response. She agreed that the NCI found that the weight of the evidence did not support an association between perineal talc exposure and increased risk of ovarian cancer because they also found the association weak as did the FDA. She agreed that cohort studies were at the top of the pyramid if you did not have clinical trials. She explained that meta-analysis reports would simply create an average that was prone to weaknesses and bias.

¶ 104   She agreed that the cohort studies did not start out looking for an association between talc and ovarian cancer but classified the studies as major events. She explained that the Nurse's Health Study began in 1976, and the women were asked in 1982 about talc usage. The women were followed to 1996, and the study showed no overall association between talc use and ovarian cancer. They found a positive association for serous ovarian cancer, but it too was a weak association. In 1996, 307 cases of ovarian cancer were reported. By 2006, 924 cases were reported. However, the

47

positive association seen in the 2000 report addressing the 1996 data for serous ovarian cancer was gone in the 2010 report addressing the 2006 data. There was no overall association between talc use and ovarian cancer and there was no dose response. The second cohort study, named the Women's Health Initiative, had 500 cases of ovarian cancer when the results were reported in 2014 and they found no association between use of baby powder and ovarian cancer. A third study involving sisters with breast cancer known as the "Sister Study" found an increased risk of ovarian cancer with douching but Dr. Osann recommended confirmation in other studies.

¶ 105  Dr. Osann testified that after those three studies were published, a fourth study called a pooled analysis was performed using the Nurse's Health Study, the Women's Health Initiative, and the Sister Study and again looked to see if there was risk for ovarian cancer associated with baby powder. The fourth study found no association. Dr. Osann explained that of the case-control studies, half showed a nonsignificant association and others showed statistically significant association, which was weak, because the risk ratio was less than two. She also addressed the bias associated with recall between people with diseases and those that did not, as well as publicity of a certain issue and how it affected the odds ratio. Dr. Osann stated that when she looked at the results of all the studies, in weighing the research, the most important thing was the strength of the association, also known as the odds ratio or the relative risk, between the exposure and the disease. She also considered the consistency of the results and the dose response. As to the Health Canada report, Dr. Osann noted that they relied on the same criteria but reached a different result. She disagreed with the Health Canada decision, stating they seemed to rely heavily on the Taher meta-analysis report which stated in a footnote that Taher had little confidence in its findings. Dr. Osann opined, based on her 30-40 years as an epidemiologist, and within a reasonable degree of medical certainty, there was no causal association between perineal use of talc and ovarian cancer.

48

¶ 106   On cross-examination, Dr. Osann clarified that she worked primarily in cancer research and focused on multiple types of cancers. She received $350,000 for her research on ovarian cancer from J&J and agreed that her publication in the National Cancer Institute Journal had nothing to do with talc. She addressed the NCI article and agreed it was an independent review not performed by the NCI. She also addressed the 2014 FDA letter that stated a warning on talc was unnecessary. She agreed that her epidemiological pyramid was different than the CDC hierarchy of evidence. The epidemiology textbook also said that placing greater weight on studies was fallacious if both the cohort and case-control studies were properly designed and carried out. She discussed the question that was added to the Nurse's study in 1984 and agreed they did not have definite numbers about the frequency or the duration of use and further agreed no differentiation between talc or corn starch was mentioned. Dr. Osann also cited Cramer's data but disagreed with his conclusions.

¶ 107   Following a lunch break, plaintiffs provided a proffer regarding what they would have accomplished during Dr. Nicholson's cross-examination. The proffer, which encompassed over 20 pages in the transcript, set forth the evidence plaintiff would have used to cross-examine Dr. Nicholson that alleged she never saw patients in a clinical setting. It further addressed J&J's risk mitigation procedures, as well as research showing an established risk between talc use and ovarian cancer all of which were found to be below a level of 2.0. These included risks assessments by Harlow at 1.50, Cramer 2009 at 1.60, Mills at 1.54, Terry at 1.24, Schildkraut at 1.44, and Cramer 2016 at 1.33. Research by Sjosten addressing migration in the reproductive system, and a letter from the Cancer Prevention Coalition to the J&J CEO. Plaintiff also addressed J&J's resources to study talc and ovarian cancer relying on letters and meetings wherein J&J addressed the issue internally or were advised of the issue from 1975 to 1995. The proffer also addressed corn starch, recommendations that women use corn starch instead of talc products, the FDA letter finding no

association between talc and ovarian cancer, the IARC finding that talc was possibly carcinogenic, and the Health Canada finding that talc was harmful to human health. Plaintiff's counsel also requested that the 16 exhibits that were placed in evidence during Dr. Nicholson's testimony be removed.

¶ 108 Defense counsel requested an opportunity to respond. The court struck the exhibits admitted during Dr. Nicholson's testimony and advised defense counsel that their response to the plaintiff's offer of proof would be allowed.

¶ 109 Thereafter, cross-examination of Dr. Osann resumed and she continued to opine that there was a weak association between genital use of talc and ovarian cancer. She agreed that relative risk of less than 2.0 could be causal "if you have other aspects together with that weak association." She explained that anything under 2.0 was weak by definition because that association in a case-control study, could easily be explained by bias and confounding. Dr. Osann disagreed that in epidemiology, all that should be considered was whether a finding was statistically significant. She stated that one had to focus on the big picture and the weight of the evidence. She would not focus on statistical significance because that applied only to chance.

¶ 110 Dr. Osann addressed the Bradford Hill criteria as discussed in the Fedak 2019 paper entitled, Emerging Themes of Epidemiology. She agreed that the nine Bradford Hill factors were: consistency, specificity, temporality, biological gradient (also known as "dose response"), biologic plausibility, coherence, experiment, and analogy. Dr. Osann stated that the paper dealt with molecular epidemiology, which was a specific subtype in epidemiology. She agreed that "statistical significance" was listed as the "accepted benchmark for judging the strength of an observed association and thus its potential causality" but again stated that the authors were

discussing molecular epidemiology which looked at genes and chromosomes, not your basic behavioral or environmental exposure.

¶ 111   Plaintiff's counsel used two forest plots to contend that the data was consistent in showing a risk. Dr. Osann disagreed in both instances. She stated that with the meta-analysis data, the relative risks were noted as 1.28, 1.31, and 1.22, which were "statistically significant" however, due to the type of data relied upon, Dr. Osann disagreed that the data showed an increased risk of developing ovarian cancer from talc. While plaintiff's counsel read portions of the Modern Epidemiology publication, Dr. Osann tried to explain that what plaintiff's counsel was reading, was not what Dr. Osann was talking about.

¶ 112   Dr. Osann agreed that the IARC and Health Canada both addressed confounding, but she stated that those studies were old and did not hold up when considered with newer data or when the agency attempted to account for an unknown confounder because no adjustment could be made for that issue, respectively. She agreed that some of the data provided a hypothetical possibility that a mechanism existed in which talc could cause ovarian cancer.

¶ 113   After the jurors were released for the day, the court noted that Dr. Nicholson had not shown up for court that day either. Defense counsel stated that it would provide its offer of proof the following day as well. Defense counsel also requested, and was granted permission, to submit an affidavit under seal related to Dr. Nicholson's health.

¶ 114   On July 28, 2021, court started with defense counsel requesting to submit to the court an *in-camera* affidavit regarding the medical evaluation of Dr. Nicholson. The request was denied. The court advised defense counsel that the statements of allocution would be provided after the close of evidence that day. Defense counsel asked if they could discuss Dr. Nicholson's failure to appear during closing and agreed they could not argue about her testimony since it was not in

51

evidence. The court stated, "Agreed." Defense counsel also asked about the court's consideration of the 5.01 instruction. The court recommended that everyone research the issue.

¶ 115   The final witness for the defense was Dr. Michael Finan, a board-certified gynecologic oncologist. He testified that talc was not a risk factor for ovarian cancer and stated that he was currently in the process of developing a screening test for ovarian cancer. He stated that the only known cause was genetic mutation. He stated that most cancers were of unknown origin including brain, kidney, stomach, colon, pancreas, breast, bladder, rectal, and anus. The outlier was lung cancer and smoking.

¶ 116   Dr. Finan reviewed Betty's records. He stated that she was 68 and had epithelial ovarian cancer which was the most common. The majority of patients who developed this cancer were between the ages of 60 and 70. Betty was Caucasian and had no children, which along with her age, increased her risk factors. He stated that his biggest issue with talc and ovarian cancer was biologic, stating that talc did not "migrate magically upward to get to the ovaries." He further noted that none of Betty's physicians asked her about talc use. He stated that additional risk factors for ovarian cancer included a family history of breast or ovarian cancer, personal history of breast cancer, estrogen replacement therapy, and endometriosis as listed by the Society of Gynecologic Oncology (SGO). He confirmed that talc was not included as a risk factor listed by the SGO. Nor was it listed with the American College of Obstetricians and Gynecologists (ACOG), which listed similar risk factors as the SGO. He stated that the ACOG website addressed talc and ovarian cancer and stated that there was no medical consensus that talcum powder caused ovarian cancer. The organization also addressed limitations associated with the studies including bias, inadequate sample sizes, and the rarity of the disease. Dr. Finan stated that the CDC reached a similar conclusion and recommended using talcum powder for genital warts after treatment. The NCI did

not list talc was a risk factor for ovarian cancer either. While the IARC issued a statement in 2010 stating that talcum powder was a risk factor for developing ovarian cancer, in a recent international cancer seminar report, in a jointly issued statement with NCI, IARC did not list talcum powder as a risk factor for ovarian cancer.

¶ 117   Moving back to the issue of migration, Dr. Finan explained that Betty never had children, which created a very narrow cervical canal. He stated that a probe the size of a paperclip was required to try to open the canal. He further explained that there were several layers of protection to protect the fallopian tubes and if it was an open system there would be numerous things that would get into the canal causing inflammation and infection. The purpose of the external genitalia and how the body was made created protective barriers from contamination. He stated that if the system was open, as claimed by plaintiff, there would be bladder and rectum inflammation which was not seen either. He classified Dr. Plunkett's anatomical drawing as cartoon-like and stated that if the body was really like the picture, he would not have to use his hands to perform a pelvic exam.

¶ 118   Dr. Finan stated that the only way talc could get to the ovaries was if the person used a talc-covered diaphragm which would put the material against the cervix. He noted, however, that research for diaphragm-using women actually showed a reduced risk of ovarian cancer. The same lack of causation and risk was seen with talc-lubricated condoms.

¶ 119   Dr. Finan expressed concern with using corn starch, especially in warmer climates, because the sugar in corn starch would feed yeast and increase yeast infections. He further explained that inflammation did not cause cancer; it was the cancer causing the inflammation. He also explained his disagreement with the Health Canada article. After addressing the relevant risk factors for Betty

53

and explaining that if baby powder caused ovarian cancer, he would expect babies would have it by their twenties, Dr. Finan opined that Betty's ovarian cancer was not caused by talc.

¶ 120   During the lunch break, the contempt actions were addressed. The court denied defense counsel's request to have a witness address the reason for Dr. Nicholson's absence. An offer of proof in response to plaintiff's offer of proof was presented by defense counsel that disagreed with Dr. Nicholson never treating patients in a clinical setting, and addressed the J&J risk mitigation procedure. The offer also addressed the Harlow study, the letter from the Cancer Prevention Coalition, the 1994 FDA symposium, the 2014 FDA denial of the citizen's petition, the studies from Cramer (1999), Mills, Sjosten, and Terry, documents related to ISRTP and the two-day talc symposium, limitations related to case-control studies, documents addressing corn starch, and the Canada Health decision.

¶ 121   The court then moved to the contempt proceedings and stated,

> "The Court makes the finding as regards to Nicholson, that she's a witness that was under the control of defendant, or defendants, however you want to look at it, and could have been produced by the exercise of reasonable diligence. That the witness was not equally available to the plaintiffs. That a reasonably prudent party under the same or similar circumstances would have produced the witness if they believed the testimony would be favorable to them. No reasonable cause for the failure has been shown.
>
> The record's been made. You can incorporate it for everything else."

Defense counsel again asked for the opportunity to put on evidence as to why Dr. Nicholson did not appear. The request was denied.

¶ 122   Following the lunch break, Dr. Finan provided cross-examination testimony. He agreed that the cause of ovarian cancer was multi-factorial and that genetic mutations could occur genetically or through exposure. He disagreed that inflammation caused ovarian cancer. He agreed that he stated the female reproductive system was closed and migration was not possible. He addressed the images of female anatomy shown, the differences in real women, as well as the muscles making up the pelvic floor.

¶ 123   Following a break, plaintiff's counsel addressed research articles discussing migration by reading the reports and asking Dr. Finan if it was read correctly. Plaintiff's counsel then did the same thing with research related to whether talc caused inflammation. He agreed that corn starch was not associated with an increased risk of ovarian cancer.

¶ 124   Following Dr. Finan's testimony, the court addressed the written statement of allocution filed on behalf of J&J regarding the contempt, which was also incorporated for Dr. Nicholson. The court found both J&J and Dr. Nicholson in minor criminal contempt and imposed a fine of $500 on each to be paid by August 27, 2021.

¶ 125   Thereafter the court addressed plaintiff's motions *in limine* related to the jury instructions and instruction 5.01. Plaintiff asked the court to admonish the defendants' trial team not to reference any aspect of Dr. Nicholson's testimony. Defense counsel agreed not to talk about her substantive testimony because it was stricken. The court stated it would allow plaintiffs in closing to talk about the negative inferences allowed under instruction 5.01. Defense counsel moved for a mistrial, stating that J&J was prejudiced in a manner that could not be cured because they were denied the opportunity to put on evidence to establish that there was a reasonable reason, *i.e.*, a medical condition, why Dr. Nicholson could not return to Illinois. Defense counsel also filed a motion for a directed verdict, that would be addressed the following day. The court stated that the

5.01 instruction would be given and "the negative inferences that you can infer are X, Y, Z." The court clarified that defense counsel could not get into the substance of Dr. Nicholson's testimony or any excuses as to why she was not there. After lunch, the parties addressed the jury instructions.

¶ 126   On July 29, 2021, the court again went over what defense counsel could not say about Dr. Nicholson's testimony. They also addressed the earlier versions of the complaints. Defense counsel said it had no intention of showing the caption. The court replied, "It's plain error." Defense counsel continued to argue but the court stated, "The complaint stays out. I don't know [how] to be more clear than that." Defense counsel was told they could not discuss the previous versions because "getting into unverified pleadings is unchartered territory." The court addressed the motion for a directed verdict and denied the motion. The remainder of the jury instructions were addressed. Closing arguments were presented by both parties. The arguments included plaintiffs discussing Dr. Nicholson's testimony despite the prior motion *in limine* that disallowed defendants from the same thing. An objection was raised and overruled by the court. After plaintiff's closing argument, defense counsel again objected and requested permission to also address Dr. Nicholson's testimony. The request was denied. Defense counsel presented its closing argument. No objection was raised.

¶ 127   Following a lunch break, the court instructed the jury. The instructions included language that stated, "If a party to this case has failed to produce a witness within their power to produce, you may infer that the testimony of the witness would be adverse to that party." The jury reached a verdict the following morning and found in favor of Johnson & Johnson and against Colleen Cadagin as Executrix of the Estate of Betty Driscoll. The jury was polled and released.

¶ 128   On August 19, 2021, plaintiffs filed a motion for a new trial pursuant to section 2-1202(b) of the Code of Civil Procedure (735 ILCS 5/2-1202(b) (West 2020)). The motion alleged that the

56

trial court abused its discretion when it struck the testimony of Dr. Nicholson, which had the effect of harming plaintiff and helping J&J. In support, plaintiffs argued that the court abused its discretion when it disregarded various plaintiff-suggested sanctions for Dr. Nicholson's failure to return for cross-examination. Plaintiffs also argued that defense counsel injected plain error into the record by displaying a prior non-operative version of an unverified complaint during opening statement and then interrogating non-party witnesses with same. Oral arguments were presented on the motion for a new trial on September 22, 2021. The court denied the motion for a new trial. Plaintiff timely appealed.

¶ 129                                    II. ANALYSIS

¶ 130   On appeal, plaintiff argues that the trial court abused its discretion in failing to grant her motion for new trial. In support, she contends the trial court abused its discretion in rejecting her sanctions after Dr. Susan Nicholson failed to appear for cross-examination. She also contends that J&J inserted plain error into the record by referring to and displaying a non-verified, non-operative version of the complaint during opening argument and examination of non-party witnesses. Plaintiff further requests, to the extent any of the issues were waived, that we review the case for plain error and also contends that the cumulative effect of the court's actions as to Dr. Nicholson's testimony and defense counsel's actions as to the prior iterations of the complaint were so egregious that a new trial is required.

¶ 131   Defendants disagree and request affirmation of the trial court's order denying the motion for new trial, the jury verdict and judgment. In support, they contend plaintiff forfeited any challenge to the striking of Dr. Nicholson's testimony under the invited error doctrine. They further contend that portions of plaintiff's argument regarding references to the original and first amended

57

complaint were waived and that even if error was found, it was harmless due to the weakness of plaintiff's case.

¶ 132                                     A. Forfeiture

¶ 133   We first address what issues were properly preserved before the trial court. It is well-established that in order " 'to preserve any alleged error for appeal, a party must object specifically both at trial and in a posttrial motion.' " *Snowstar Corp. v. A&A Air Conditioning & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 83 (quoting *La Salle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 826 (2008)). If an issue is not properly preserved, the issue is forfeited. *Id.* The plain-error doctrine may allow a court to consider forfeited issues (*Matthews v. Avalon Petroleum Co.*, 375 Ill. App. 3d 1, 8 (2007)); however, the " 'doctrine is applied in civil cases only where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process itself.' " *Id.* (quoting *Lange v. Freund*, 367 Ill. App. 3d 641, 649 (2006)).

¶ 134   Here, plaintiff's first issue contends that the trial court erred in striking Dr. Nicholson's testimony due to her failure to appear for the completion of her cross-examination. The record reveals that after Dr. Nicholson's non-appearance for cross-examination on July 26, 2001, was confirmed, despite the trial court ordering her to do so on July 23, 2001, plaintiff's counsel requested to make a motion as to what the remedies should be. The court asked what plaintiff was requesting and then stated, "I mean off the top of my head, there'd be two remedies: A 5.01 instruction, and striking of the testimony." As noted above, the response from plaintiff's counsel requested a finding of contempt and as sanctions for the contempt: (1) disallowance of Dr. Kuffner's testimony, (2) disallowance of Dr. Osann's testimony, (3) allowing plaintiff's counsel to tell the jury what would have been brought out during Dr. Nicholson's cross-examination,

58

(4) striking all of J&J's defenses, and (5) advising that jury of the contempt order. At no time was any specific objection raised as to the court's decision to strike Dr. Nicholson's testimony by plaintiff. Nor, as claimed by defendants, did plaintiff request the testimony be stricken. As such, the invited error doctrine does not apply, and the issue, which was not properly preserved, is limited solely to plain-error review.

¶ 135 Contrary to plaintiff's request on appeal for sanctions pursuant to Illinois Supreme Court Rule 219(c) (eff. July 1, 2002), the sanctions requested at trial were based on plaintiff's request to find Dr. Nicholson in contempt. The court found Dr. Nicholson in contempt on July 26, 2021, and later reiterated the finding on July 28, 2021, after it allowed Dr. Nicholson to provide a statement in allocution and fined her $500. Notably, the contempt findings were appealed and reversed by this court after finding the trial court mischaracterized the type of contempt but, more importantly, failed to offer due process procedural safeguards to the defendants named therein. *People v. Johnson & Johnson*, 2022 IL App (5th) 210250, ¶¶ 18, 21.[6] Regardless, at no time did plaintiff request sanctions pursuant to Rule 219(c) while the case was before the trial court. As such, plaintiff's arguments regarding Rule 219(c) sanctions were also improperly preserved.

¶ 136 Plaintiff also contends that J&J inserted plain error into the record by referring to and displaying a non-verified, nonoperative version of the complaint during opening statement, and when cross-examining Dr. Smith, Sharon Carney and Jesse Carney. Notably, no objection was raised when plaintiff addressed the complaint during opening statement. Further, defense counsel addressed both the complaints with Dr. Smith shortly before the lunch break. No objection was raised during the cross-examination. At the beginning of the lunch break, the court asked the

---

[6]Where the underlying finding of contempt was in error, it is axiomatic that no error can be shown for a denial of sanctions related to the erroneous finding of contempt.

attorneys if there was anything that needed to be addressed. No objection to defense counsel addressing the prior complaints was raised. Nor was any objection raised when Sharon Carney was asked about the allegations of usage in the complaint.

¶ 137   It was not until Jesse Carney's testimony that the first objection was lodged. The record makes it appear that the objection was initially raised *sua sponte* by the trial court. However, the trial court later clarified that it saw plaintiff's counsel trying to get the court's attention and therefore called for a recess at the bench. Therefore, the first three references to the prior iterations were not properly preserved and only the objections raised during Jesse's testimony were properly preserved.

¶ 138   "[I]n order for the [plain error] doctrine to apply in a civil case, the party proposing the use of the doctrine must show a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process itself." *Nwaokocha v. Illinois Department of Financial and Professional Regulation*, 2018 IL App (1st) 162614, ¶ 68 (citing *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 55). Similar to criminal cases requesting plain-error review, two elements must be shown. *Id.*; see *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Here, plaintiff must first show prejudicial error. *Nwaokocha*, 2018 IL App (1st) 162614, ¶ 68. If prejudicial error is shown, plaintiff must then show that the error was so egregious that she was deprived of a fair trial and the integrity of the judicial process was impaired. *Id.*

¶ 139                                   B. The Denied Sanctions

¶ 140   Plaintiff's initial argument contends that the trial court erred in striking Dr. Nicholson's testimony after she failed to return for cross-examination. They claim that striking the testimony

60

was beneficial to Johnson & Johnson and harmed plaintiff because the jury heard improper testimony.

¶ 141   "As a general rule, striking erroneously admitted evidence will cure any error that may have been created, except in extreme cases." *Dugan v. Weber*, 175 Ill. App. 3d 1088, 1099 (1988) (citing *Zorn v. Zorn*, 126 Ill. App. 3d 258, 265 (1984)). Here, in addition to striking all of Dr. Nicholson's testimony, the trial court specifically advised the jury that Dr. Nicholson's testimony was stricken, and they were told "not to consider" her testimony and to "wipe it out as if it never happened." This was not the first time the jury was advised about stricken testimony. After the jury was sworn in on the first day of trial, the court advised the panel that if the court struck evidence or comments of counsel or a witness, the panel would be instructed to "completely disregard it and erase those from you mind as if they were never mentioned."

¶ 142   Therefore, in addition to striking the testimony, which in and of itself will cure the error except in extreme cases (see *id.*), the trial court admonished the jury to disregard the testimony. It is well-established that when the trial court admonishes the jury to disregard certain testimony, any possible prejudicial effect will be sufficiently cured. *People v. Speight*, 153 Ill. 2d 365, 373 (1992). Jurors are presumed to follow the trial court's instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Here, the jurors were twice told during the trial what to do if testimony was stricken.

¶ 143   While plaintiff contends that it is "fanciful to even contemplate that human beings, subjected to 144 minutes of slick direct examination on the part of J&J *** can magically disregard that presentation," it provides no evidence to rebut the presumption that the jurors failed to follow the trial court's instruction. This is especially true when Dr. Nicholson's direct examination

61

amounted to only a little over two hours and plaintiff had the opportunity to cross-examine the witness for nearly two hours before the end of the day.

¶ 144 Regardless of the time utilized for cross-examination, in addition to striking the testimony, the trial court issued a missing witness instruction. The missing witness

"instruction should be given when: (1) the missing witness was under the control of the party adversely affected by the instruction; (2) the witness could have been produced by reasonable diligence; (3) the witness was not equally available to the party who requested the instruction; (4) a reasonably prudent person would have produced the witness if he or she believed the testimony would be favorable; and (5) there was no reasonable excuse for failing to produce the witness." *Lisowski v. MacNeal Memorial Hospital Association*, 381 Ill. App. 3d 275, 284 (2008) (citing *Schaffner v. Chicago & North Western Transportation Company*, 129 Ill. 2d 1, 22 (1989)).

The instruction is incorporated into IPI Civil (2020) No. 5.01. The instruction "allows the jury to infer that any evidence not offered but within the control of a party is adverse to that party." *First National Bank of LaGrange v. Lowrey*, 375 Ill. App. 3d 181, 210 (2007).

¶ 145 Here, in addition to striking the testimony, and providing the curative instruction to the jury, the trial court advised the jury that Dr. Nicholson was found in contempt for her failure to appear for cross-examination and also included Illinois Pattern Jury Instructions, Civil, No. 5.01 (hereinafter IPI Civil No. 5.01) in the jury instructions. After closing arguments, the trial court instruction to the jury stated, "If a party to this case has failed to produce a witness within their power to produce, you may infer that the testimony of the witness would be adverse to that party." We further note that plaintiff's case involved 11 witnesses over eight days compared with

62

defendants' use of 4 witnesses over three and a half days and the fact that plaintiff declined any opportunity to present rebuttal testimony following the close of defendants' case. Given the protections afforded to plaintiff by striking the testimony and providing a curative instruction, even if error could be found by the trial court's action of striking the testimony, which we cannot find, we would not find that the error was prejudicial to plaintiff.

¶ 146   Plaintiff next argues that the trial court erred by failing to grant it additional sanctions that included barring Dr. Kuffner from testifying, barring Dr. Osann from testifying, an opportunity to present a proffer to the jury as to what testimony would have been received from Dr. Nicholson on cross-examination, and a striking of J&J's defenses. As to barring the two additional witnesses, the sole argument presented to this court was that J&J would simply 'reboot' the points intended to be made by Nicholson with the two other witnesses. Plaintiff then argues that barring the testimony was "very much fair under the circumstances." No further argument was presented and no citation to authority in support of the claim was made. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited."). Given the paltry nature of the argument, we cannot find it was error, say nothing of prejudicial error, for the trial court to deny plaintiff's request for sanctions that would bar two defendants' expert witnesses.

¶ 147   Plaintiff also argues that the trial court erred in denying the third requested sanction that would have allowed her to provide a proffer to the jury of additional points she would have covered during Dr. Nicholson's cross-examination. She argued to the trial court that the direct examination testimony did "not stand unchallenged." On appeal, plaintiff argues that the request "squarely met the fiction that a layperson juror can simply disregard over two hours of slick direct testimony just because [a] judge says so." Beyond that statement, however, no further argument was presented

63

on appeal and no citation to authority in support of the claim was provided. See *id*. ("Points not argued are forfeited.").

¶ 148   As noted above, no argument was presented that rebutted the presumption that the jury was incapable of following the trial court's instruction, especially when plaintiff used almost two hours of cross-examination and was the last party to address the witness before the jury was released on July 23, 2021. More importantly, we reviewed the 20-page offer of proof provided by plaintiffs as to what details might have been gleaned during Dr. Nicholson's cross-examination, along with the four-page rebuttal offer of proof by defendants. We found nothing in the offers of proof so compelling that error can be found, especially when the majority of what was contained in the offer of proof was already discussed by another expert. More importantly, plaintiffs provide no citation wherein any court would allow a party to make a proffer to a jury related to cross-examination testimony when the underlying testimony had already been struck. Accordingly, we find no error in the trial court's denial of plaintiff's request to present a speculative proffer as to its proposed cross-examination after the trial court struck the underlying testimony.

¶ 149   Finally, plaintiff argues that its fourth suggestion, *i.e.*, striking J&J's defenses, was consistent with the outcomes in *Pickering v. Owens-Corning Fiberglas Corp.*, 265 Ill. App. 3d 806, 820 (1994) and *Johnson v. Owens-Corning Fiberglas Corp.*, 233 Ill. App. 3d 425, 435 (1992). It further claims such a sanction would have the "effect of compelling compliance with the trial Court's Order for Nicholson to return to finish her cross-examination." As to the latter claim, we find it wholly speculative, as there is no indication in the record that Dr. Nicholson would have returned for this, or any other basis, since counsel's affidavit indicates that Dr. Nicholson's inability to return for cross-examination was related to an underlying medical issue and an upswing in COVID-19 cases in the area. Further, plaintiff provides no argument as to what specific defenses

were at issue or whether Dr. Nicholson's testimony would have been affected by the unspecified defenses.

¶ 150   Plaintiff's former argument fares no better. In *Pickering*, the plaintiff served notices to appear directed to four of Owens-Corning's officers and counsel. *Pickering*, 265 Ill. App. 3d at 813. Three of the people entered special and limited appearances and counsel moved for a protective order. *Id.* The defendant also moved to quash the notices to appear. *Id.* The motions to quash were denied and the defendant was warned that if the individuals were not presented, sanctions pursuant to Illinois Supreme Court Rule 237 (eff. Nov. 1, 1978) would be imposed. *Id.* at 813-14. Neither the officers nor corporate counsel appeared, and the plaintiff moved for sanctions. *Id.* at 814. The trial court granted the motion and imposed the sanctions that included, *inter alia*, striking the defendant's pleadings, admitting all of the plaintiff's allegations in the complaint, requiring the plaintiffs to show a *prima facie* case, and if shown, would grant a default judgment against Owens-Corning; further on damages, Owens-Corning would not be allowed to cross-examine any witnesses on the issue of liability, and no current or former officers, directors, or employees could present evidence and the defendant was denied the ability to present any evidence on the company's net worth. *Id.* at 814-815.

¶ 151   The plaintiff later sent discovery requests and interrogatories related to the company's net worth to defendant. *Id.* at 815. Owens-Corning again objected and was ordered to comply with the discovery request or face additional sanctions. *Id.* at 815-16. Owens-Corning ignored the order and more sanctions followed that allowed the plaintiffs to amend their complaint alleging that Owens-Corning had a net worth of $1.5 billion, required the company to admit the allegation and prohibited the company from contesting the amount. *Id.* at 816. On appeal, the sanctions under Rule 237(b) were upheld based on the corporation's repeated recalcitrance to abide by valid

65

discovery requests and court orders. *Id.* at 819-22. A similar outcome occurred in *Johnson*, 233 Ill. App. 3d 425.

¶ 152   Here, unlike *Pickering* and *Johnson*, the sanctions were not requested under Rule 237. Instead, the sanctions, as alleged on appeal, were requested under Illinois Supreme Court Rule 219(c) (eff. July 1, 2002). However, as noted in *Pickering*, sanctions under Rule 219(c) are allowable only " 'as are suitable and necessary to enable the party seeking discovery to obtain the objects of the discovery he seeks but the court may not impose sanctions which are designed not to accomplish the objects of the discovery but to impose punishment.' " *Pickering*, 265 Ill. App. 3d at 820 (quoting *People ex rel. General Motors Corp. v. Bua*, 37 Ill. 2d 180, 197 (1967)).

¶ 153   Here, the information requested from Dr. Nicholson was not in discovery, it was cross-examination at trial. Further, even if the goal of requiring Dr. Nicholson's presence was the basis of the sanction, to not allow testimony of other witnesses who were present for both direct and cross-examination would impose punishment on J&J, which is specifically prohibited under Rule 219(c). As such, we find *Johnson* and *Pickering* distinguishable and find no error in the trial court's decision to deny the sanction of striking defendant's defenses based on one witness's failure to return for cross-examination. We find this especially true in light of the fact that the basis of the trial court's "sanctions" was a finding of contempt, the contempt finding was ultimately reversed on appeal (see *Johnson & Johnson*, 2022 IL App (5th) 210250, ¶¶ 18-21), and six days after the decision as issued, plaintiff filed its brief in the case at bar, presenting a new argument requesting sanctions under Rule 219(c).

¶ 154       C. Reliance on Prior Iterations of the Non-Verified Complaint

¶ 155   Plaintiff also contends that defense counsel introduced plain error into the proceedings by referring to and showing prior iterations of the unverified initial and first amended complaints.

Plaintiff relies heavily on the trial court's outrage when the issue was finally addressed during Jesse's testimony. However, as noted above, no objection was raised when the prior iterations were discussed during opening statement, or during the testimonies of Dr. Smith and Sharon Carney.

¶ 156 Typically, when an amended complaint is filed that does not refer to or incorporate the prior pleadings, the prior pleadings are considered abandoned. *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 154 (1983). However, the abandonment does not mean the prior pleadings are irrelevant. If the prior complaint was verified, the allegations found therein are considered binding judicial admissions which can be used to show that the witness previously swore to a different set of facts that directly contradict their current position. *Farmers Auto Ass'n v. Danner*, 394 Ill. App. 3d 403, 412 (2009). If the initial complaint was unverified, the allegations are only binding judicial admissions where no amended complaint is ever filed. *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 558 (2005). When an unverified complaint is amended, the admission in the prior pleading can only be used as an evidentiary admission, not as a judicial admission. *Id.* (citing *Yarc v. American Hospital Supply Corp.*, 17 Ill. App. 3d 667, 670 (1974)). Unlike judicial admissions which are generally binding, evidentiary admissions are subject to contradiction or explanation. *Id.*; see also, *Chavez v. Watts*, 161 Ill. App. 3d 664, 672-73 (1987) ("an admission in an unverified pleading is merely an admission against interest which may be contravened or explained.").

¶ 157 Once the amended complaints were filed, the prior allegations could no longer be considered judicial admissions. *Knauerhaze*, 361 Ill. App. 3d at 558. However, the allegations could still be used as evidentiary admissions. *Id.* Here, defense counsel used the complaint to discuss the basis of an expert's opinion as well as the allegations in the complaint. The initial complaint alleged that Betty used Johnson's Baby Powder and Shower to Shower regularly and

67

habitually throughout her adult life, which would equate to approximately 50 years. However, the second amended complaint limited the usage to Johnson's Baby Powder and now claimed use from adolescence through her adult life, which equated to almost 60 years despite affidavits limiting the usage from 1965 to 1971 and again from 1996 to 2002, amounting to approximately 12 years. Notably, Dr. Smith's report was prepared prior to the filing of the second amended complaint and questions were asked about the discrepancy in Betty's usage and how, if at all, it affected Dr. Smith's causation opinion. Further, Sharon was listed in the interrogatories as a person with knowledge about Betty's talc usage. As such, the basis of defense counsel's questions revolved around whether Sharon provided the basis for the initial complaint. Sharon's responses revealed that she did not know the basis for the original complaint, and she could only visually confirm Betty's usage from 1966 to 1970. As the basis of defense counsel's questions were appropriate for both Dr. Smith and Sharon, we cannot find error in defense counsel's use of the prior iterations in cross-examining the witnesses or by referencing the usage during opening argument.

¶ 158    The remaining portion of this issue addresses the questions asked during Jesse's testimony. As noted above, this was the only properly preserved issue on review. Jesse was also listed as a witness with knowledge about Betty's usage of baby powder. Jesse's testimony ultimately revealed that he had no knowledge of Betty's actual use of baby powder, although he inferred possible use based on his testimony about seeing powder under the sink in Betty's house. Instead, Jesse's testimony was limited to Betty's one-time purchase of Johnson's Baby Powder at a Walgreens in the 1990s. When defense counsel asked if Jesse was aware that his cousin was suing Walgreens, the court held a sidebar, and following the sidebar, the trial court instructed the jury to disregard the reference to the lawsuit involving Walgreens.

¶ 159   Once again, we do not find defense counsel's cross-examination of Jesse to be error except for the question about the pending Walgreens lawsuit. However, any error that might have stemmed from defense counsel's mention of the lawsuit with Walgreens was cured by the immediate instruction to the jury to disregard any mention of the Walgreens lawsuit. "A jury is presumed to have followed the court's instruction to disregard testimony." *Buckholtz v. MacNeal Hospital*, 337 Ill. App. 3d 163, 170 (2003). There was no evidence submitted or argued on appeal that rebuts the presumption that the jury acquiesced with the court's direction. As such, we find no error with defense counsel's questions related to the prior iterations of the complaint, and any error stemming from mention of the Walgreens lawsuit was cured by the court's instruction.

¶ 160   Here, plaintiff claimed error based on the court's handling of Dr. Nicholson's testimony following her failure to appear for cross-examination and defense counsel's reliance on the prior iterations of the complaint. As shown above, no error, say nothing of prejudicial error, can be shown. Therefore, plaintiff's claim of cumulative error is untenable. Accordingly, we affirm the trial court's denial of plaintiff's motion for a new trial, the jury verdict and judgment.

¶ 161                                III. CONCLUSION

¶ 162   For the above-stated reasons, we affirm the trial court's judgment.


¶ 163   Affirmed.